**P. LaRue SIMPSON, Plaintiff,**

v.

**ERNST & YOUNG, Defendant.**

No. C–1–91–196.

United States District Court, S.D. Ohio, Western Division.

Sept. 23, 1994.

the property and funds of the corporation [and] the property rights, vesting rights and interests of members."

See also, 850 F.Supp. 648.

Janet Gilligan Abaray, Theodore M. Berry, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, for plaintiff LaRue Simpson.

Michael Samuel Glassman, Dinsmore & Shohl, Cincinnati, OH, Elizabeth B. Healy, Ernst & Young, New York City, for defendants Ernst & Young, A partnership Accounting Firm, Gerry Hill, Managing partner.

## ORDER

STEINBERG, United States Magistrate Judge.

This case is before the Court on Plaintiff P. LaRue Simpson's Employment Retirement Income Security Act (ERISA) claim, following arguments thereon and post-hearing pleadings. (Docs. 242, 245, 246, 253). We also consider evidence presented during the jury trial on Simpson's Age Discrimination in Employment Act (ADEA) claim against Ernst & Young, which resulted in a verdict in Simpson's favor. The parties unanimously consented to entry of final judgment by the United States Magistrate Judge.

Simpson contends that Ernst & Young discharged him in retaliation for his requests regarding retirement plan benefits. He also contends that Ernst & Young discharged him with intent to interfere with the attainment of his retirement rights, in order to avoid its obligation to pay retirement benefits to him. Simpson seeks lost retirement benefits; compensatory damages, including back pay, front pay, and emotional distress damages; punitive damages; and attorney's fees and expenses. He also seeks statutory relief of $100 a day for Ernst & Young's failure to provide him with requested pension information.

## FINDINGS OF FACT

1. Defendant Ernst & Young is a large accounting firm created in October 1989 by the merger of the Ernst & Whinney and Arthur Young accounting firms. Plaintiff Simpson, a Certified Public Accountant (CPA), was born on September 27, 1943. Prior to his relationship with Ernst & Young, Simpson worked for Arthur Young's Cincinnati, Ohio office from December 1986 to the merger on October 1, 1989. He was Cincinnati Managing Partner from 1987 to 1989. From October 1972 to December 1986, Simpson worked for KMG/Main Hurdman (KMG/MH), an accounting firm Arthur Young acquired in 1986. He was Managing Partner of KMG/MH's Denver and Cincinnati offices from 1981 to 1986.

2. In June 1989, Arthur Young distributed to its partners a Merger Agreement and an Information Document For Partners. The Information Document represented that the worldwide combination of Arthur Young and Ernst & Whinney would result in the largest and strongest international professional services firm in the world. The two firms were described as compatible because, among other things, they "care for individuals by promoting and recognizing them based on performance" and have "mutual respect among partners." Both were estimated to have good increases in their 1990 and 1991 cash earnings, despite merger costs. The Information Document represented that Arthur Young partners would receive equal or better benefits under the Ernst & Young retirement plan. They represented to their partners and the public that the merger was

not expected to result in a reduction in partners.

3. On October 1, 1989, the merger was effected. The merged firm organized itself into two entities: Ernst & Young and Ernst & Young U.S. The Ernst & Young Partnership Agreement (Partnership Agreement) required the signatories, who are termed "Partners," to be CPAs and to sign a second agreement, the Ernst & Young U.S. Partnership Agreement (U.S. Agreement). The signatories to the U.S. Agreement were not termed "Partners," but were denominated "Parties" and consisted of individuals who were both CPAs and non-CPAs. The CPAs were referred to as "Capital Account Parties," and the non-CPAs were termed "Investment Account Parties."

4. Both Ernst & Whinney and Arthur Young maintained Cincinnati offices before the merger. Gerald Hill was Ernst & Whinney's Cincinnati Managing Partner. Simpson was Arthur Young's Cincinnati Managing Partner. Following the merger, Ernst & Young named Hill Cincinnati Managing Partner. Simpson was named Cincinnati Director of Entrepreneurial Services, a lesser position.

5. A Management Committee, consisting of ten to fourteen Parties and a Chairman, was responsible for the management of Ernst & Young U.S. and Ernst & Young. Its responsibilities included addition or discharge of Parties, decisions on mergers and acquisitions, allocation of earnings among the Parties, and appointment or removal of the Chairman. The Management Committee also had many responsibilities and duties regarding the retirement plan described in the U.S. Agreement, Section 12 (Ernst & Young Plan).

6. The original members of the Management Committee included Jesse Miles, who was also Chairman, John Schornack, and James Boland.

7. Simpson was covered by four Ernst & Young retirement plans: 1) the Ernst & Young Plan, 2) the Defined Benefit Plan, 3) the Retirement Savings Plan, and 4) the UBT Account.

8. The Defined Benefit Plan and the Retirement Savings Plan each had a five year vesting requirement.

9. The Ernst & Young Plan, embodied in Section 12 of the U.S. Agreement, has age and years of service vesting requirements. Vesting does not occur until the participant reaches age 53. If the participant retires at an age less than 58, he needs either 15 years as a partner or 20 years with the firm to vest. If the participant retires at age 58 or thereafter, there is no years of service requirement. There is a 4% reduction of benefits for each year of service with the firm under 25 years. The amount paid to a retiree under the Ernst & Young Plan is offset by the retiree's benefits under the Defined Benefit and Retirement Savings Plans.

10. The UBT [1] Account is available only to previous partners [2] of Arthur Young, including Simpson. Before the merger, Arthur Young partners had a right to this money as a part of their retirement package, which was to be paid to them over an eight year period following withdrawal or retirement from the firm. Before the merger, UBT Accounts accrued interest over time. As a term of the merger, the UBT Accounts were carried over to Ernst & Young and the UBT Account values were frozen as of September 30, 1989.

11. Each former Arthur Young partner, including Simpson, was allowed to elect retirement under the plan Arthur Young had in place before the merger (Arthur Young Plan), with a frozen UBT Account value, or under the Ernst & Young Plan, with forfeiture of the UBT Account.

12. If Simpson had remained employed at Ernst & Young and retired at age 60 in 2003, he would have had 17 years of service with Arthur Young and Ernst & Young. Due to

---

1. UBT is an acronym for unbilled time and uncollected fees. It is an account receivable. Newly admitted Arthur Young partners purchased UBTs over an eight year period following their admission as partners.

2. We do not draw a legal conclusion that Simpson was an Arthur Young partner. That issue and the facts relating to it were not before the Court. We accept the term as one used by the parties.

the 4% reduction of service factor for each year with the firm under 25 years, he would have then vested 68% in the Ernst & Young Plan.

13. On September 27, 1989, Simpson, on behalf of himself and Ernst & Young partners Jerry Hindman and Donald Fritz, wrote to Management Committee Member Schornack, with copies to Management Committee Member Boland and Cincinnati Managing Partner Gerald Hill, requesting years of service credit for their prior service with KMG/MH. Simpson's concerns were: 1) under the Ernst & Young Plan, he would not be fully vested at retirement due to the years of service requirement and service reduction factor; and 2) he was losing his UBT Account's accruing benefits.

14. Schornack responded to Simpson on October 30, 1989, with copies to Boland and Hill, that Simpson, Hindman, and Fritz would not be given credit for their prior service with KMG/MH. Schornack also stated that he did not understand the basis of Simpson's concern that he could not become 100% vested under the Ernst & Young Plan.

15. On November 8, 1989, Simpson again wrote Schornack, with copies to Boland and Hill, "to clarify what we believe to be inequities existing in our pensions due to the merger with [Ernst & Whinney]." Simpson requested a calculation of his retirement benefits as a future Ernst & Young retiree, including UBT Account values, and a calculation of what his retirement benefits would have been under the Arthur Young Plan, including UBT Account values. He asked for the vesting requirements of both plans. Simpson's concern was made clear in the closing paragraph: "For me to spend 27 years as a partner and not receive 100% retirement benefits just is not fair."

16. On November 28, 1989, Simpson wrote Boland, with copies to Schornack and Hill, enclosing calculations showing that at certain earning levels he would receive less under the Ernst & Young Plan than he would have received under the Arthur Young Plan.

17. On December 12, 1989, Schornack presented Simpson's prior correspondence to Management Committee Chairman Miles for his consideration.

18. On December 20, 1989, Simpson communicated directly to Miles on this issue.

19. On December 28, 1989, Miles responded to Schornack, with a copy to Simpson, stating that he did not understand some of Simpson's comments and that Simpson did not understand the retirement plan details. Miles calculated the Ernst & Young Plan vesting percentages of Hindman and Fritz upon retirement at age 60 to be 88% and 100% respectively. Miles did not calculate Simpson's vesting percentage at age 60. He noted that Simpson would vest in the Defined Benefit and Retirement Savings Plans if he remained with the firm until December 1991. Miles' letter concludes:

> After writing this epistle it is fairly clear we are dealing with complex matters that are difficult to understand without investing substantial time. If you wish I will subject myself to interrogation by LaRue and do my best to explain how all the plans work, including UBT. (I really do not wish to write further on this subject, however.)

20. On January 11, 1990, Simpson again wrote Schornack on this issue, with copies to Miles, Boland, and Hill.

21. On February 7, 1990, Schornack issued a terse response to Simpson, with copies to Boland and Hill, that the letter he received from Miles was the "final word" and that he should "call it a day" on the subject.

22. Simpson was the only employee who contacted Miles regarding this issue.

23. At the time of the merger, an actuarial analysis of the present value of the merged firms' retirement benefit plans showed that accumulated future pension benefit obligations were $290,000,000 higher than the funding available. This shortfall, if and when it became due in the future, would have to be paid from the firm's current earnings. Standard accounting practices required Ernst & Young to footnote the shortfall amount in its financial reports.

24. Despite its' pre-merger representations that the merger was not expected to result in a reduction in partners, the Man-

agement Committee concluded that a substantial number of partners would have to be discharged. An October 5, 1989 memorandum from Ernst & Young's first Management Committee meeting stated "excess professional staff capacity to be about 8%" and the "Plan is to act on 5% excess by November 15...."

25. Beginning in late 1989 and continuing to early 1990, the Management Committee adopted a process of resignations and retirements to reduce the number of partners in order to protect the firm from a substantial reduction in profits. Management Committee Chairman Miles characterized this process as a "lay off." The specific date this process was adopted is not documented in the record.

26. The December 18, 1989 Management Committee meeting agenda included items entitled "Partner movement and retention" and "1990 Partner Admissions." "Partner movement" meant discharging as well as retiring partners. The agenda included a list of former Arthur Young partners by age, showing the total number of years with Arthur Young, the total number of years as a partner, and any break in service. The agenda also included a list of former Ernst & Whinney partners by age, showing the total number of years with Ernst & Whinney and the total number of years as a partner. These are items considered in determining whether an individual has worked the years necessary to vest in a retirement plan.

27. The February 21, 1990 Management Committee agenda itemized "Partner resignations and retirements" as well as the "1990 Partner recommendation process." Regarding the former, the agenda included a table entitled "Comparison of Partner Ages in Fiscal 1990," which grouped firm members by age.

28. The Management Committee had the right to request Simpson to terminate his relationship with Ernst & Young U.S. by giving him six months written notice.

Simpson had no right to appeal his discharge or the discharge of any other firm member.

29. In May 1990, Ernst & Young U.S. requested Simpson's resignation. There are no contemporaneous Management Committee minutes or other documentation setting forth either the date of or the reason for this decision. Nor was any credible evidence presented establishing either the specific date the Management Committee decided to discharge Simpson[3] or a legitimate reason therefor. Simpson refused to resign. On June 19, 1990, he was given written notification that he was discharged effective December 19, 1990.

30. As of the effective date of his discharge, Simpson was 46 years old. At that time, he had not vested in the Defined Benefit Plan, the Retirement Savings Plan, or the Ernst & Young Plan. Simpson would have vested in the Defined Benefit Plan and Retirement Savings Plan in December 1991. Simpson would have vested in the Ernst & Young Plan when he reached age 58 and had 15 years of service in December 2001.

31. When the Management Committee voted to discharge Simpson, they were aware of Simpson's retirement vesting dates.

32. The money that would have been paid to Simpson had he vested in the Defined Benefit, Retirement Savings, and Ernst & Young Plans remained in those plans, inuring to the benefit of those not discharged.

33. Neither Hindman nor Fritz were discharged.

34. During the period October 1, 1989 through March 25, 1991, Ernst & Young U.S. discharged 120 older partners while admitting 162 younger partners. The mean age of the partners discharged was 44.80. The mean age of the partners admitted was 37.50. The mean salary of the partners discharged was $174,443. The mean salary of the partners admitted was $128,741. The discharge of the older partners and admission of younger partners reduced Ernst & Young annual salary obligations by $5,484,240. It also sub-

---

3. Ernst & Young, through Boland's testimony, alleges that the discharge decision was made in April 1990. As explained *infra*, pp. ——-——, we find that testimony not credible. Boland

testified during his deposition that he could not recall the discharge decision date (Doc. 218, p. 1716–17), and Ernst & Young presented no documentary evidence showing the decision date.

stantially reduced the firm's shortfall in future pension benefits obligations, which where based on salary rates. Under the Ernst & Young Plan, retirement benefits were based on the retiree's three highest years salary.

35. Simpson's 1990 salary was $194,092.

36. Simpson was replaced by Fritz, a younger person with a lower salary.

37. 10.8% of the discharged partners were not vested in the Defined Benefit or Retirement Savings Plans.

38. A substantial majority of the discharged partners were not vested in the Ernst & Young Plan.[4]

39. The Management Committee voted to discharge Simpson in part because of his retirement inquiries and to reduce the firm's $290,000,000 shortfall in future pension benefits obligations.

40. Upon his discharge in December 1990, Ernst & Young advised Simpson that he would be paid $61,047 as reflected on a Statement of Accounts and $47,594 from the UBT Account, the latter to be paid out over an eight year period. Ernst & Young advised Simpson that this calculation was binding on the parties. In March 1993, however, Ernst & Young told Simpson that it had made an error in calculating the $61,047 amount and would withhold $10,425 from Simpson's future UBT Account payments.

41. Because of Ernst & Young's actions, Simpson lost $421,747 in past retirement benefits and $290,782 in future retirement benefits.[5]

## CONCLUSIONS OF LAW

■ The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq., is a comprehensive statute designed to protect employees and their beneficiaries regarding employee benefit plans.

*Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 137, 111 S.Ct. 478, 481, 112 L.Ed.2d 474 (1990), *citing Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983). In promulgating ERISA, Congress intended to cure several specific problems: 1) employees with long years of employment were losing anticipated retirement benefits due to lack of vesting; 2) the soundness and stability of benefit plans were endangered by inadequate funding; and 3) employees and beneficiaries were being deprived of anticipated benefits due to termination of plans before the accumulation of sufficient funds. 29 U.S.C. § 1001(a).

ERISA imposes participation, funding, and vesting requirements upon pension plans. *Ingersoll–Rand,* 498 U.S. at 137, 111 S.Ct. at 481. It also sets forth uniform standards, including rules for reporting, disclosure, and fiduciary responsibility for both pension and welfare plans. *Id.* The statute provides for criminal penalties and civil enforcement. 29 U.S.C. §§ 1131, 1132.

■ Congress expressly included a broad preemption clause in ERISA, wherein it supersedes "... any and all state laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144. The preemption clause is deliberately expansive, so that pension plan regulation is an exclusive federal concern. *Ingersoll–Rand,* 498 U.S. at 138, 111 S.Ct. at 482, *citing Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987).

As part of ERISA, Congress enacted 29 U.S.C. § 1140, which prohibits the discharge of "a participant ... for exercising any right to which he is entitled under the provisions of an employee benefit plan, [or] this subchapter," or "for the purpose of interfering with the attainment of any right to which

---

**4.** Ernst & Young contends 89% of the discharged partners were not vested in the Ernst & Young Plan; Simpson contends the figure is 96.69%. Ernst & Young's figure is not verifiable. Simpson's figure is mathematically incorrect.

**5.** In its verdict on Simpson's age discrimination claim, the jury found he had lost $421,747 in

past retirement benefits and $290,782 in future retirement benefits. Ernst & Young did not challenge this determination in its briefs on the ERISA issues. The jury's findings are supported by the evidence, including the testimony of plaintiff's expert, Harvey Rosen.

such participant may become entitled under the plan, [or] this subchapter...."

Congress enacted § 1140 primarily to prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining retirement benefits. *West v. Butler*, 621 F.2d 240, 245 (6th Cir.1980). Congress viewed this as an integral part of ERISA because without it, employers would be free to circumvent the provision of promised benefits. *Ingersoll–Rand*, 498 U.S. at 143, 111 S.Ct. at 485. However, ERISA does not guarantee every employee a job until he or she has fully vested in his or her pension plan. *Dister v. Continental Group, Inc.*, 859 F.2d 1108 (2d Cir.1988).

To prove a *prima facie* case under § 1140, the plaintiff must show by a preponderance of the evidence: 1) prohibited employer conduct 2) taken for the purpose of interfering 3) with the attainment of any right to which the employee may become entitled. *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir.1992). To satisfy the second element, plaintiff must show that the employer had a specific intent to engage in the proscribed activity. Id. Proof of specific intent may be shown by direct evidence or, more often, by circumstantial evidence. *Gavalik v. Continental Can Co.*, 812 F.2d 834, 852 (3d Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987). The plaintiff is not required to show that the employer's sole purpose in discharging him was to interfere with his pension benefits, but that it was a motivating factor in the decision. *Humphreys*, 966 F.2d at 1043. The loss of benefits incidental to a legitimate discharge does not constitute an ERISA violation. *Gavalik*, 812 F.2d at 851. Otherwise, any action by an employer that resulted in an economic savings would be suspect since pension rights are a substantial component of any employer's economic situation. *Humphreys*, 966 F.2d at 1044.

To prove a *prima facie* retaliation case under § 1140, the plaintiff must show by a preponderance of the evidence 1) that he engaged in activity protected under ERISA; 2) that he was the subject of an adverse employment action; and 3) that there is a causal link between the employee's protected activity and the employer's adverse action. *See Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1090 (8th Cir.1992); *Cooper v. City of North Olmsted*, 795 F.2d 1265 (6th Cir.1986).

If the plaintiff proves a *prima facie* case, it is then the employer's burden to introduce evidence of a legitimate, nondiscriminatory reason for its challenged action. *Humphreys*, 966 F.2d at 1043. If the employer successfully asserts a legitimate reason for the plaintiff's discharge, then the plaintiff must prove that interference with pension benefits was a motivating factor in the employer's discharge decision, the burden of persuasion always being borne by the plaintiff. *See St. Mary's Honor Center v. Hicks*, — U.S. —, —, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993).

If the plaintiff shows that the employer's proffered reasons are pretextual, the plaintiff must still prove that interference with pension benefits and/or retaliation for protected ERISA activity was a motivating factor in the discharge decision. *See* id. at — – —, 113 S.Ct. at 2749–50. The factfinder's disbelief of the employer's proffered reasons, particularly if disbelief is accompanied by evidence of mendacity, may, together with the elements of a *prima facie* case, suffice to permit an inference of intentional interference with pension benefits and/or retaliation. *See* id. at —, 113 S.Ct. at 2749; *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir.1994). To refute the employer's proffered reasons, the plaintiff may show by a preponderance of the evidence either: 1) that the proffered reasons had no basis in fact; 2) that the proffered reasons did not actually motivate his discharge; or 3) that the proffered reasons were insufficient to motivate his discharge. *See Manzer*, 29 F.3d at 1083.

## I. The Ernst & Young Retirement Plans Are Covered By ERISA

Ernst & Young has conceded that the Defined Benefit Plan is an ERISA plan. (Doc. 166, p. 29). Ernst & Young contends that

the Retirement Savings Plan, the Ernst & Young Plan, and the UBT Account are not covered by ERISA. It also contends that the Ernst & Young Plan is a "top hat" plan and therefore is exempt from ERISA.

A retirement or pension plan covered by ERISA is:

> any plan, fund, or program . . . established or maintained by an employer . . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—(i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits under the plan.

29 U.S.C. § 1002(2)(A).

An ERISA pension plan must include employees:

> The term 'employee benefit plan' shall not include any plan, fund or program . . . under which no employees are participants. . . . For example, a so-called 'Keogh' or 'HR–10' plan under which only partners or only a sole proprietor are participants covered under the plan will not be covered under title I. However, a Keogh plan under which one or more common law employees, in addition to self-employed individuals, are participants covered under the plan, will be covered by title I.

29 C.F.R. § 2510.3–3(b).

■ The definition of an ERISA pension plan is intentionally broad and is in keeping with Congress's intent to establish pension plan regulation as an exclusive federal concern. *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 138, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990).

■ One purpose of ERISA is to correct abuses occurring in the management of pension plans held in trust for workers. *Robertson v. Alexander Grant & Co.,* 798 F.2d 868, 870 (5th Cir.1986), *cert. denied,* 479 U.S. 1089, 107 S.Ct. 1296, 94 L.Ed.2d 152 (1987), *citing* S.Rep. No. 127, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. &

Ad.News 4838, 4838–44 *and* H.Rep. No. 533, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 4639, 4639–43. Employees in such relationships are more vulnerable to abuses than genuine partners because employees typically lack control over pension plan management and power to decide whether to extend pension benefits to certain employees. Id. In contrast, a genuine partner has more control and decision-making power because of his right to vote in partnership affairs. Id. The true partnership arrangement also has a self-policing feature whereby partners have an incentive not to agree to provisions that may harm certain members of the partnership because each partner knows that he could ultimately be the harmed partner. Id. On the other hand, the employer is motivated to earn profits for himself or the shareholders and has less incentive to treat his employees as fairly as a partner would treat other partners. Id. Because of this difference between true partnership arrangements and employer-employee relationships, Congress intended to regulate and protect only the latter. Id.; *Schwartz v. Gordon,* 761 F.2d 864, 867–69 (2d Cir.1985). The administrative regulation exempting Keogh plans from ERISA furthers Congress's intent. Self-employed persons, unlike employees, have complete control over the amount, investment, and form of the retirement fund and do not need ERISA protection. *Schwartz,* 761 F.2d at 868.

■ Earlier in this case, Ernst & Young contended that the three retirement plans at issue were not subject to ERISA because they covered only partners. In an earlier opinion, we found that Simpson was an employee rather than a genuine partner, thus rejecting that contention. We relied upon *Nationwide Mutual Insurance Co. v. Darden,* 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992), which indicates that traditional legal concepts are the criteria for determining whether an individual is an employee for ERISA purposes. We found that under traditional employee and partnership law concepts, Simpson and other similarly situated "partners" were actually employees. (Doc. 188). Thus, the pension plans in ques-

tion do cover employees, even though they denominate them partners.

There are two elements to an ERISA pension plan. It must: 1) be established or maintained by the employer for the benefit of its employees; and 2) provide retirement income for employees or result in income deferral payable by employees upon termination of the employment relationship. 29 U.S.C. § 1002(2)(A).

There is no dispute that Ernst & Young established the Retirement Savings Plan and the Ernst & Young Plan. Although Arthur Young established the UBT Account, the right to receive money from that fund after the merger was enforceable against Ernst & Young. Thus, Ernst & Young maintained the UBT Account. By their express terms, the Retirement Savings Plan and the Ernst & Young Plan provide for retirement income. *See Commercial Mortgage Insurance Inc. v. Citizens National Bank of Dallas*, 526 F.Supp. 510 (N.D.Tex.1981). The UBT Account results in a deferral of Arthur Young income for a period extending to the termination of the employment relationship. See 29 U.S.C. § 1002(2)(A)(ii). Therefore, the Retirement Savings Plan, the Ernst & Young Plan, and the UBT Account are ERISA pension plans. 29 U.S.C. § 1002(2)(A).

Affording Simpson ERISA protection is in keeping with ERISA's purpose to protect the employee who is vulnerable to management abuses regarding his retirement funds. *See Robertson*, 798 F.2d at 870. Simpson lacked any meaningful control and voting rights in Ernst & Young and was thus unable to protect himself against Management Committee decisions regarding his retirement benefits. (Doc. 188, p. 32). Concern that his retirement benefits were being substantially reduced because of the merger and Management Committee decisions as to the new retirement arrangement's terms motivated Simpson's letters. Ernst & Young defended its actions as economically necessary, contending that certain partners had to be discharged in order to maintain the financial status quo of those remaining, thereby evidencing its posture as one of an employer

rather than a partnership. Such actions are precisely the reason for ERISA protection of employees. Simpson was an individual Congress specifically intended to protect under ERISA: he had long years of service but was losing anticipated benefits due to lack of vesting. *See* 29 U.S.C. § 1001(a).[6]

▪ Ernst & Young contends that the Retirement Savings Plan is exempt from ERISA coverage because it is a Keogh plan. In our earlier opinion, we referred to the Retirement Savings Plan as "a H.R. 10 Plan (Keogh Plan)" because this was the name used by the parties for this plan. *See, e.g.,* Doc. 163, p. 38. Our previous acceptance of this label does not preclude our present finding that the Keogh exception does not apply to Simpson regarding the Retirement Savings Plan. Keogh plans are intended to cover self-employed individuals and owner-employees. 26 U.S.C. § 401(c). A Keogh plan, however, may cover both partners and employees. Where it does, only the latter receives ERISA protection. 29 C.F.R. § 2510.3–3(b); *see Fugarino v. Hartford Life and Accident Insurance Co.*, 969 F.2d 178, 186 (6th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1401, 122 L.Ed.2d 774 (1993). For the reasons expressed in our earlier opinion finding Simpson to be an employee (Doc. 188), the Retirement Savings Plan is not exempt from ERISA coverage.

▪ Ernst & Young also contends that the Ernst & Young Plan is a "top hat" plan, exempt from ERISA's vesting, funding, and fiduciary responsibility provisions. Therefore, Simpson "obtains no greater rights than those under the terms of [the Ernst & Young Plan]." (Doc. 246, p. 5).

▪ ERISA Part 2, entitled Participation and Vesting (29 U.S.C. §§ 1051 to 1061), ERISA Part 3, entitled Funding (29 U.S.C. §§ 1081 to 1086), and ERISA Part 4, entitled Fiduciary Responsibility (29 U.S.C. §§ 1101 to 1114) do not apply to pension plans maintained "primarily ... for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3),

---

**6.** Simpson did not voluntarily jump from employer to employer; he was a steady worker who was employed at three different accounting firms because of acquisitions and mergers of the firms.

1101(a)(1). To qualify as a "top hat" plan, there must be a significant disparity between the average compensation of the top hat group and the average compensation of all other employees. *Belka v. Rowe Furniture Corp.,* 571 F.Supp. 1249 (D.Md.1983).

Although Simpson's 1990 salary was $194,092, this alone does not mean he was highly compensated when compared to the average compensation of Ernst & Young employees. In an earlier proceeding in this case, Miles testified that his 1990 salary was $580,000, almost three times Simpson's salary. (Doc. 144, p. 292). Some partners in the firm received salaries approaching $800,000. (Doc. 207, p. 1073). Although Simpson was a CPA, he was not an office manager. Many parties covered by the Ernst & Young Plan were non-managerial CPAs, serving an audit function. Since no evidence was presented as to the average compensation of all employees covered by the Ernst & Young Plan, it is not possible to tell whether they were all highly compensated employees. *See Belka,* 571 F.Supp. at 1252–53. Thus, we find that the Ernst & Young Plan does not fall into the "top hat" exemption. Assuming, *arguendo,* that it is a "top hat" plan, it would not be exempt from Part 5, entitled Administration and Enforcement, which includes §§ 1140 and 1132, the sections under which Simpson has brought his ERISA claim. *See supra,* p. 815. It would also not be exempt from Part 1, entitled Reporting and Disclosure, which includes §§ 1024 and 1025, the other ERISA sections on which Simpson bases his claim. Id.

For all the above reasons, the four plans in question are ERISA plans.

## II. Simpson Is A Participant In The Ernst & Young Plan

■ Ernst & Young contends that Simpson was not a participant in the Ernst & Young Plan because he never satisfied the eligibility requirements.

■ A participant is "any employee ... who is or may become eligible to receive a benefit of any type from an employee benefit plan...." 29 U.S.C. § 1002(7). Thus, an ERISA plan participant does not have to be presently eligible to receive plan benefits. The fact that Simpson had not yet attained the age or years of service requirements does not mean that he was not a participant. To hold otherwise would limit ERISA protection only to those who have already vested or have obtained nonforfeitable rights to pension benefits.

Ernst & Young also contends that our finding that Simpson was an employee precludes him from eligibility under the Ernst & Young Plan since eligibility is predicated on admission to the partnership. This argument has no merit. Ernst & Young did not cite the section of the Ernst & Young Plan setting forth this requirement. Furthermore, the Ernst & Young Plan is embodied in the U.S. Agreement, which was carefully drafted to apply to "Parties," rather than to "Partners." Also, the Ernst & Young Plan provided retirement income to both "Capital Account Parties" (CPAs) and to "Investment Account Parties" (non-CPAs), the latter being specifically excluded as Partners from the Ernst & Young Partnership Agreement. Thus, the Ernst & Young Plan contemplates payment of retirement income to non-partners. Even if the plan applies only to partners, Simpson was denominated a partner, although we have found him and other partners to meet the legal definition of "employee."

## III. Simpson Has Shown By A Preponderance Of The Evidence That Interference With Attainment Of His Pension Benefits Was A Determining Factor In Ernst & Young's Discharge Decision

■ Ernst & Young contends that Simpson has failed to prove that it acted with the specific intent to interfere with his pension benefits when it made the discharge decision. In support of its contention, Ernst & Young argues that there was not sufficient proximity between the discharge decision date and the dates when Simpson would have vested in the retirement plans. Ernst & Young also contends that Simpson's discharge resulted in no present economic savings.

The evidence of Ernst & Young's prohibited conduct for the purpose of interfering with Simpson's attainment of ERISA rights, *see infra,* pp. 820–821, establishes his *prima facie* case under § 1140. *See Humphreys,* 966 F.2d at 1043. Ernst & Young has met its burden of articulating legitimate, nondiscriminatory reasons for Simpson's discharge by contending it discharged Simpson because of an independence problem, poor performance, and poor attitude. *Id.*

Simpson has established by a preponderance of the evidence that Ernst & Young's articulated reasons for discharge are pretextual. At the jury trial on Simpson's ADEA claim, the jury found none of these reasons credible. For the following reasons, we agree.[7]

Ernst & Young contended during the trial that Simpson was discharged because of an independence problem regarding Simpson's personal loans from a lending institution that became an Ernst & Young client as a result of the merger. Ernst & Young went to great lengths, including calling an expert witness, to convince the jury that this independence issue was a substantial problem regarding Simpson's performance. Despite a contemporaneous memorandum from Hill to Boland outlining the alleged independence problem,[8] the undisputed evidence shows that after Ernst & Young investigated the matter, Management Committee Member Boland advised Simpson that his loans *did not* present an independence problem. Thus, Simpson was exonerated regarding the independence issue before he was discharged. *See* Boland testimony, Doc. 218, p. 1761. The extent to which Ernst & Young attempted to expand this matter into a critical performance issue that warranted Simpson's discharge indicates that it was concealing the true motive for discharge.

Ernst & Young also contended at trial that Simpson was discharged because he had an inadequate number of billable hours, failed to cooperate in the investigation of the alleged independence problem, entered into a poor lease arrangement for the Arthur Young office, and spent too much of the firm's money on marketing and client development.

Ernst & Young attempted to portray Simpson as a disgruntled worker who was unhappy with his demotion from the position of Cincinnati Managing Partner. Simpson had once before been subjected to a demotion as a result of a merger. When KMG/MH merged with Arthur Young, Simpson lost his Managing Partner position. He quickly regained it. Thus, Simpson was familiar with merger politics, and the fact that he may not have been pleased with his demotion resulting from the Ernst & Young merger is not a measure of his performance.

After the merger, Simpson was granted a "unit increase," which is an indicator of good performance. As of December 1989, Simpson's salary was increased 17% over the prior year. Such an increase is substantial and not merely a cost of living increase. It indicates that Simpson's superiors at Ernst & Young viewed his performance as more than acceptable.

Management Committee Chairman Miles was unaware of any alleged performance problems when he voted to discharge Simpson. (Doc. 207, p. 1054). Nor is there evidence that any other Management Committee members save Boland were aware of alleged performance problems when they voted to discharge Simpson. Had such problems been the basis for Simpson's discharge, one would expect to find a memorandum

---

7. In order to find in favor of Simpson on his age discrimination claim, the jury had to have found the reasons advanced by Ernst & Young to be pretextual. We agree with the jury's conclusion. In any event, we are bound by that jury finding regarding Simpson's ERISA claim. *See Gutzwiller v. Fenik,* 860 F.2d 1317, 1332 (6th Cir.1988).

8. Hill appeared to be on a campaign to eliminate his former competitor, Simpson. After the merger was announced, but before it took place, Hill approached his Ernst & Whinney superior Boland to tell him that Simpson was not the type of person the firm wanted. (Doc. 212, p. 1560). Boland later chose Hill over Simpson as Cincinnati Managing Partner. Shortly after Hill and Simpson began working together, Hill raised the independence issue through the aforementioned memorandum. There is no evidence that the Management Committee was aware of any of this information when it voted to discharge Simpson.

from Boland, Simpson's Regional Supervisor, to the Management Committee detailing the problems and recommending discharge. No such document was introduced. Furthermore, Ernst & Young produced no evidence that it had formally evaluated Simpson's performance and/or found it lacking. Ernst & Young did not have an evaluation procedure in place when Simpson's discharge decision was made.

The Management Committee had available to it performance evaluations reflecting Simpson's tenure at Arthur Young, but did not review them before discharging him. This indicates they were not concerned with performance when they made their discharge decision. Simpson's Arthur Young evaluations were all favorable. His apt performance at Arthur Young is also shown by his promotion to Arthur Young Cincinnati Office Managing Partner.

Ernst & Young's proffered reason is also contradicted by the testimony of their own expert witness, economist Julia Lane. She testified that when a firm makes a decision to discharge a partner, labor economics theory and experience indicate that the discharge decision is based on productivity; i.e., whether the employee is producing more or less than he is costing the firm. To make this determination, it is very important to review the worker's performance evaluations. (Doc. 212, p. 1353). Workers are not likely to be discharged during their first year, because the firm is in the process of determining whether the individual can adequately perform the job and will provide him a reasonable opportunity to do so. (Id. at p. 1367). According to Dr. Lane's prognostication, a worker is most likely to be discharged during the tenth year of employment with a given employer and least likely to be discharged during the first year. (Doc. 212, p. 1370). Ernst & Young had employed Simpson for less than a year when it discharged him.[9] It

is most likely that Ernst & Young decided to discharge Simpson at the February 21, 1990 Management Committee meeting (*see* review of documentary evidence, *supra,* p. 811), which was less than four months after he began working for Ernst & Young and only two months after he received a substantial salary increase.[10] Ernst & Young rendered its discharge decision, at the latest, in May 1990, only seven months after the merger and only five months after Simpson received a substantial salary increase. Dr. Lane's testimony demonstrates that Simpson's discharge was contrary to her theory of normal business practice.

Supporting our view of Dr. Lane's testimony is the fact that Simpson was required to formally set his 1990 goals in December 1989, yet he was discharged before half the year had elapsed. He was not given a reasonable time to meet the goals set. This indicates that Simpson was discharged for some reason other than failing to meet his performance goals.

Prior to his May 22, 1990 conversation with Boland, at which time he was asked to resign, Simpson had not been informed of any performance problems and given a chance to offer an explanation or take corrective action. On May 22, 1990, Simpson returned to his office after a coffee break to find Boland sitting there. Boland got up, closed the door, and asked Simpson to resign. Simpson testified that Boland's conduct completely surprised him. In view of Ernst & Young's acknowledged policy to give their workers an opportunity to correct performance problems, Ernst & Young's failure to even warn Simpson and give him a chance to improve his performance makes it unlikely that performance had anything to do with Simpson's discharge. Simpson was not a clerical worker, but a CPA with many years of experience. He was specialized in representing entrepreneurial businesses. As such,

---

9. Dr. Lane placed Simpson in his fourth year of Ernst & Young employment, taking into account his prior Arthur Young service, and testified his discharge was consistent with her theory. We agree with the jury in rejecting this conclusion. It is more reasonable to consider Simpson to have been in his first year of Ernst & Young employment, because the merger placed him under the supervision of former Ernst & Whinney

partners Hill and Boland, who were not familiar with Simpson's past performance.

10. A February 21, 1990 discharge decision would have been made shortly after Miles' December 28, 1989 and Schornack's February 7, 1990 responses to Simpson's pension inquiries.

the firm had an investment in Simpson. If performance was really an issue, it would be much more likely that management would take steps to improve Simpson's performance rather than summarily discharge him.

The validity of Ernst & Young's proffered reason for discharging Simpson is also called into question by the absence of any contemporaneous record of the date the decision was made or the reasons therefor. The undated Ernst & Young Management Committee document memorializing Simpson's discharge gives no reason for his discharge, performance or otherwise. Hill's September 1990 memorandum, purporting to list several reasons for Simpson's discharge, came after Simpson filed an EEO complaint and must be considered self serving. Common sense dictates that in the case of a legitimate discharge decision, documentation would be made contemporaneously with the discharge decision, not four to seven months later. The lack of documentation surrounding Simpson's discharge by the self-proclaimed world's largest accounting firm, which constantly relies on documentation in performing its daily functions, is highly unusual.

Through Boland's testimony at trial, Ernst & Young presented reasons for discharging Simpson that had not previously been asserted during discovery. This suggests that Ernst & Young invented such reasons sometime after discovery concluded. At trial, Boland claimed Simpson's performance at Arthur Young in 1986 was poor. Boland also testified that conversations he had with others about Simpson—before the merger and before he even met Simpson—influenced his decision that Simpson be discharged. (Doc. 218, pp. 1586–87). In his deposition, however, Boland testified that an individual's performance before the October 1989 merger was not relevant to him insofar as it related to his evaluation of that individual. (Doc. 218, p. 1589).

Boland's testimony as to the reasons for Simpson's discharge conflicted with that of Management Committee Chairman Miles and Cincinnati Managing Partner Hill. Boland testified that Simpson was "absolutely not" discharged because of the general need to reduce partners as a result of the merger.

He claimed Simpson was discharged for his poor attitude and poor performance. (Doc. 218, p. 1686). In direct contrast, Miles testified that Simpson was discharged as part of a nationwide reduction in force due to the overall economic situation faced by the newly merged firm. (Doc. 207, pp. 1025–26, 1056). In further contrast, Hill testified that Simpson was discharged primarily because his charge hours were low (Doc. 209, p. 1139) and because of a local economic recession in the Cincinnati, Ohio area. (Doc. 209, p. 1141, 1246–47).

The testimony of Miles, Boland, and Hill also conflicted on the subject of who made the decision to discharge Simpson. Hill initially claimed that he decided to discharge Simpson (Doc. 209, p. 1111), but later acknowledged he had no authority to make such a decision. (Doc. 209, p. 1271). Hill also claimed that he recommended Simpson's discharge to Boland. (Doc. 209, p. 1138). Boland testified that he made his own decision to discharge Simpson. (Doc. 218, p. 1671). There was no documentation that Boland made a discharge decision, nor was there any evidence that he presented his asserted discharge decision to the Management Committee for approval. Miles testified that the Management Committee decided to discharge Simpson. He said Simpson was discharged along with many others as part of a general economic lay off. (Doc. 207, p. 1083).

Miles' testimony that Simpson and others were discharged for economic reasons is credible to the extent that it appears most likely that economic reasons motivated Ernst & Young's discharge of older partners in order to lessen its salary and future pension obligations. That conclusion is supported by the contemporaneous documentary evidence. (Def.Tr.Ex. 582). Boland and Hill, on the other hand, were impeached numerous times by their prior statements and other contradictory evidence, and no contemporaneous documentary evidence supports their testimony. We do not credit Miles' conclusory denials of age discrimination and ERISA violations for the reasons set forth herein.

The startling inconsistencies in the testimony of the three superiors directly involved

in Simpson's discharge undoubtedly influenced the jury, as it does the Court, in finding that the legitimate reasons these witnesses proffered are not credible.

Thus, Simpson has shown by a preponderance of the evidence that the discharge reasons proffered by Ernst & Young based on Simpson's performance and attitude either had no basis in fact or did not actually motivate his discharge. *See Manzer,* 29 F.3d at 1083–1085. Therefore, there exists a permissive inference that Ernst & Young discharged Simpson for the purpose of interfering with his ERISA protected rights. *See* id. at 1083, *explaining St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The lack of any notification to Simpson of his alleged performance problems shows that Simpson had no way of knowing the firm was contemplating his discharge. Because only Ernst & Young knows the real reason behind Simpson's discharge, the pretext finding is more significant than it might be in a case where both sides had access to that information. We find Ernst & Young's proffered explanations to be so unworthy of belief as to allow the permissive inference, together with the evidence of a *prima facie* case, to support a judgment in Simpson's favor. *See* id.

In addition, we now look to the evidence surrounding Simpson's discharge to determine whether a preponderance of the evidence shows that ERISA violations motivated the discharge.

It is more likely than not that the decision process to lay off partners began in December 1989. The December 18, 1989 Management Committee agenda includes a list of former Arthur Young and Ernst & Whinney partners by age, showing the total number of years with each respective firm and the total number of years as a partner. These are items considered in determining whether a participant has reached the vesting requirements for the Defined Benefit Plan, Retirement Savings Plan, and Ernst &

Young Plan. The February 21, 1990 Management Committee agenda addresses "Partner resignations and retirements" and, in that regard, included a table entitled "Comparison of Partner Ages 1990." Age is one factor in determining whether a participant has reached the vesting requirements of the Ernst & Young Plan.[11] Neither Miles, the Management Committee Chairman, nor Boland, a Management Committee Member, could offer a legitimate explanation of what use the Management Committee made of these figures. (Doc. 207, p. 1053; Doc. 218, p. 1736).

It is significant that the tabular breakdown of the individuals by age and years of service was attached to the December 1989 agenda under the heading "Partner movement and retention" rather than the heading "Partners Pension Plan status report." What is equally significant is what is *not* attached to either the December 1989 or February 1990 agendas. If the Management Committee had been making discharge decisions based on legitimate business reasons, such as employee productivity, billable hours, client base, and/or revenue production, it would be expected that such information, including performance evaluations, would have been attached to the agendas with regard to the topics of "Partner movement" or "Partner resignations." *See Nemeth v. Clark Equipment Co.,* 677 F.Supp. 899, 905 (W.D.Mich. 1987). Had such been the case, Ernst & Young would have had a more compelling argument that the effect on Simpson's retirement benefits was merely incidental.

This evidence, coupled with the existence of a $290,000,000 unfunded future pension obligation and economic expert Harvey Rozen's testimony as to the resulting savings to Ernst & Young, *see infra,* p. 822, indicates that, in addition to age, interference with the attainment of retirement benefits was a motivating factor in Ernst & Young's discharge decisions. This evidence also indicates that Ernst & Young's decision to discharge

---

11. Age, as a criterion for making a discharge decision, does not itself violate ERISA. However, when age is an eligibility requirement of a retirement plan, the use of age as a criterion for making a discharge decision, if found to be a motivating factor in the discharge decision, may result in an ERISA violation. *See Hazen Paper Co. v. Biggins,* —— U.S. ——, ——, 113 S.Ct. 1701, 1707, 123 L.Ed.2d 338 (1993).

Simpson was made with the specific intent to interfere with Simpson's attainment of pension benefits in the Defined Benefit Plan, Retirement Savings Plan, and Ernst & Young Plan. *See also Gavalik*, 812 F.2d at 854; *Pennachio v. Farrell Lines, Inc.*, 85 Civ. 6953, 1987 WL 26796, at *5 (S.D.N.Y. Nov. 25, 1987).

Because Simpson had a vested right to receive payment from the UBT Account, Ernst & Young's discharge decision was not made with the specific intent to interfere with Simpson's attainment of those retirement benefits. Subsequently, however, after telling him the calculated amounts were binding on the parties, Ernst & Young withheld from Simpson funds payable to him under that retirement plan. Ernst & Young's withholding of money from Simpson's UBT Account payments supports an inference of mendacity on Ernst & Young's part. *See Hicks*, —— U.S. at ——, 113 S.Ct. at 2749.

**A. Ernst & Young's Contention That There Is Insufficient Proximity Between The Discharge Date And The Vesting Date Is Not Persuasive**

Ernst & Young contends there was not sufficient proximity between the discharge date and the dates when Simpson would have vested in the retirement plans to support a causal connection between Simpson's discharge and his retirement plans.

■ The discharge decision was made known to Simpson in May 1990, effective December 1990. Simpson was then already vested in the UBT Account; therefore, his discharge did not affect the attainment of his rights thereto. He would have vested in the Defined Benefit Plan or Retirement Savings Plan after five years of combined service with Arthur Young and Ernst & Young, in December 1991. Thus, his discharge came one year before he vested in two of the plans. This is sufficiently proximate, combined with the other evidence, to warrant an inference of intent to violate ERISA. At the earliest, Simpson would have vested in the Ernst & Young Plan at the age of 58 and after 15 years of service, in December 2001. The time differential between Simpson's discharge and his vesting date in the Ernst &

Young Plan is too lengthy to alone support an inference of intentional interference with pension rights. However, the ability to substantially reduce the $290,000,000 pension obligation shortfall on Ernst & Young's financial statements demonstrates an immediate economic benefit the firm achieved by discharging Simpson and others. In other words, it is not time between discharge and the Ernst & Young Plan vesting date that supports an inference of an ERISA violation, but rather the proximity between the discharge date and the reduction of future pension benefit obligations

■ Assuming, *arguendo*, that Simpson showed insufficient proximity between the date of the discharge decision and the vesting dates, *see e.g., Humphreys*, 966 F.2d at 1044, this is not fatal to his claim. Although proof of proximity is circumstantial evidence of intent, lack of proximity does not preclude Simpson from offering other evidence, both direct and circumstantial, of Ernst & Young's intent, which he has done. *See e.g., Gavalik*, 812 F.2d at 834.

*Garrett v. Detroit Edison Co.*, No. 86–1257, 1988 WL 12208 (6th Cir. Feb. 16, 1988), *Clement v. Madigan*, 820 F.Supp. 1039 (W.D.Mich.1992), and *Brown v. ASD Computing Center*, 519 F.Supp. 1096 (S.D.Ohio 1981), cited by Ernst & Young, are distinguishable because they address the period between the employee's protected activity and the employer's retaliatory action, rather than the period between the discharge decision and the vesting date.

In *Humphreys*, the fact that the employee was discharged two months before his vesting date, coupled with a resulting general economic savings to the employer, was not enough to sustain the employee's claim in the face of the fact that the mine that the employee had managed was sold and the fact that he was perceived as not being a "company man", which the Sixth Circuit found to be legitimate reasons for the discharge decision. What was fatal to the employee's claim in *Humphreys* was that he failed to show a causal link between his pension benefits and the discharge decision. *Humphreys*, 966 F.2d at 1044. In contrast, Simpson has

shown that in the several months before his discharge and that of other employees, the Management Committee was reviewing its employees' status based upon their eligibility requirements for vesting in the retirement plans, rather than for legitimate business reasons. The discharge of these employees resulted in an immediate reduction of future pension benefit obligations, permitting Ernst & Young to show a more favorable picture in its financial statements.

## B. Ernst & Young's Contention That Simpson's Discharge Resulted In No Present Economic Savings Is Not Persuasive

Ernst & Young contends that Simpson's discharge resulted in no present economic savings, thus precluding his ERISA claim. This contention has no factual or legal basis.

 Ernst & Young cites no caselaw in support of its position. Proof of specific intent to interfere with the attainment of pension benefits constitutes an ERISA violation, whether or not the interference is successful and whether or not the employee would have received the benefit absent the interference. *Gavalik,* 812 F.2d at 851–52, *citing Zipf v. American Telephone and Telegraph Co.,* 799 F.2d 889, 893 (3rd Cir.1986). This is evidenced in the language of § 1140, which forbids certain conduct taken for the purpose of interfering with the attainment of any right to which the participant *may* become entitled. *Zipf,* 799 F.2d at 893. Thus, to prevail, it is not necessary for Simpson to show that Ernst & Young's decision to discharge him and 119 others resulted in an actual reduction of the firm's $290,000,000 unfunded future retirement plan obligation that existed in October 1989. It is sufficient to show that Ernst & Young *intended* to reduce its pension obligations.

Nevertheless, the average savings to Ernst & Young per person terminated was $45,702, which resulted in an annual savings of $5,484,240. Economist Harvey Rozen testified that this annual savings directly reduced the amount of the unfunded retirement obligation, since the base for calculating retirement benefits under the Ernst & Young Plan was the average of the retiree's three highest years' salary. The average age of the discharged partners was 44.8 as compared to the average age of 37.5 for newly admitted partners. Based on this, Dr. Rozen testified that Ernst & Young reduced the present value of its retirement obligation by postponing the date upon which such benefits would be paid.

We are also not persuaded by Ernst & Young's contention that had interference with the attainment of pension rights been a motivating factor, it would have selected more partners for discharge who had not yet vested in the retirement plans. The facts do not support this contention; while only 10.8% of the discharged partners were not vested in the Defined Benefit and Retirement Savings Plans, a very substantial majority of the discharged partners were not vested in the Ernst & Young Plan.

This finding is not intended to have a chilling effect on an employer's ability to analyze its economic situation, including its present and/or future pension obligations. Employers must be able to discharge employees for economic reasons. Employers must be able to review their future pension obligations to insure that they may be fulfilled. But when an employer discharges an employee with the specific purpose of preventing that employee from receiving pension benefits, the employer violates ERISA.

## IV. The Favorable Jury Verdict On Simpson's Age Discrimination Claim Does Not Bar His ERISA Claim

 Ernst & Young contends that Simpson's ERISA claim is barred by the prior jury verdict that he was discharged by Ernst & Young because of his age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* Ernst & Young contends that since the jury was instructed in the ADEA trial that they must find in Simpson's favor if they find by a preponderance of the evidence that Ernst & Young would not have discharged Simpson but for his age, that the jury already ruled that age was the determining factor in his discharge, therefore precluding any other determining factor.

Ernst & Young's argument is disingenuous. The pertinent jury instruction was as follows:

> In this case, it's undisputed that the Plaintiff was in the protected age group and he was discharged by the Defendant. You must decide whether Plaintiff's age was a "determining factor" in Defendant's discharge decision. Although there may be more than one factor involved in the decision to discharge him, Plaintiff is nevertheless entitled to recover if age was a determining factor. In other words, if you find by a preponderance of the evidence that Defendant would not have discharged Plaintiff but for his age, you must find for Plaintiff. If Plaintiff has failed to prove his age was a determining factor in his discharge, you must find for Defendant.

To find in favor of Simpson, the jury did not have to find that age was *the* determining factor, only that age was *a* determining factor. Thus, there may have been more than one determining factor in Ernst & Young's discharge decision. *See Hazen Paper Co. v. Biggins,* —— U.S. ——, ——, 113 S.Ct. 1701, 1707, 123 L.Ed.2d 338 (1993). Therefore, the fact that Simpson prevailed on his age discrimination claim against Ernst & Young does not preclude his ERISA claim.

■■■ Furthermore, to accept Ernst & Young's argument would be tantamount to a finding that the "but for" instruction given to the jury *at the behest of Ernst & Young* was improper. This we will not do. The Sixth Circuit has used the "a determining factor" and "but for" concepts interchangeably; the two instructions are not different in any substantive way. *Cooley v. Carmike Cinemas,* 25 F.3d 1325 (6th Cir.1994).

### V. Simpson Has Shown By A Preponderance Of The Evidence That He Was Discharged In Retaliation For Inquiring Into His Retirement Benefits

■■■ Regarding Simpson's retaliation claim, Ernst & Young contends that Simpson's letters address items to which he was not entitled under the terms of any of the retirement plans. Specifically, Ernst & Young contends that Simpson was asking only for a hypothetical calculation concerning his UBT Account, which was something "outside" the retirement plans. We have already determined that the UBT Account is an ERISA plan. *See supra* p. 815. Ernst & Young contends that Simpson's complaints about what a retirement plan did or did not provide is not equivalent to exercising a right under a retirement plan. Ernst & Young also contends that Simpson's letters did not relate to rights under ERISA's subchapter I.

■■■ The evidence that Simpson engaged in protected activity which caused his discharge, *see infra,* pp. 824–825, establishes his *prima facie* case of retaliation under § 1140. *See Rath,* 978 F.2d at 1090. Ernst & Young met its burden of articulating legitimate, nondiscriminatory reasons for Simpson's discharge. *See supra,* pp. 817–818.

Simpson has established by a preponderance of the evidence that Ernst & Young's articulated reasons are pretextual.

ERISA's § 1140 prohibits the discharge of a participant for exercising any right to which he is entitled under a retirement plan or under subchapter I, 29 U.S.C. §§ 1001 thru 1145. Thus, we must examine ERISA's statutory provisions in addition to the specific retirement plan provisions in determining Simpson's retaliation claim. *See Pennachio,* 1987 WL 26796 at *4.

Pursuant to 29 U.S.C. § 1024(b)(1), the plan administrator must provide to each participant "all modifications and changes" to an ERISA plan. Pursuant to 29 U.S.C. § 1024(b)(4),

> The administrator shall, upon written request of any participant … furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

Pursuant to 29 U.S.C. § 1025(a), a plan participant has a statutory right to inquire into the benefits available to him under an ERISA plan. This section provides:

> Each administrator of an employee pension benefit plan shall furnish to any plan

participant or beneficiary who so requests in writing, a statement indicating, on the basis of the latest available information—(1) the total benefits accrued, and (2) the nonforfeitable pension benefits, if any, which have accrued, or the earliest date on which such benefits will become nonforfeitable.

The plan administrator is also required to provide computations to support the amount stated upon a plan participant's request. *Bartling v. Fruehauf Corp.*, 29 F.3d 1062 (6th Cir.1994); *Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Plan and Trust Agreement*, 822 F.Supp. 247 (E.D.Pa.1993), *reversed on other grounds*, 24 F.3d 1491 (3rd Cir.1994). Individualized reporting and disclosure play an important role in effecting ERISA's goals and replaces the limited disclosure provisions of the prior Welfare and Pension Plan Disclosure Act. *Barrowclough v. Kidder, Peabody & Co., Inc.*, 752 F.2d 923, 933–34 (3rd Cir.1985), *overruled on other grounds by Pritzker v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110 (3rd Cir.1993). The broad disclosure interest protected·is the ability of a participant to effect his financial planning. Id. Disclosure should be favored where it will help participants understand their rights. *Bartling*, 29 F.3d at 1069.

Simpson's letters and the responses thereto show that his inquiries were not limited to questions involving the UBT Account. Simpson was making a comparison between his expected retirement benefits before and after the merger; only one factor in that comparison was the UBT Account value. Simpson's dialogue with the Management Committee began with a request on behalf of himself and two others that they be granted credit for their prior years service with KMG/MH. Simpson subsequently requested that "someone calculate what our retirement benefits, including our UBT values, would have been under the former [Arthur Young] plan and the E & Y plan." Simpson also asked for the "difference in our vesting between the former [Arthur Young] plan and E & Y plan."

Simpson's requested information was the type of individualized reporting that ERISA sought to provide for participants to enable them to do their financial planning. *Barrowclough*, 752 F.2d at 933–34. This was squarely an inquiry as to the benefits available to him under an ERISA plan, including a calculation of those benefits and a request for information as to a modification in his retirement benefits. Furthermore, Simpson's expressed concern that "to spend 27 years as a partner and not receive 100% retirement benefits just is not fair" is one evil ERISA seeks to protect against; i.e., employees with long years of service losing retirement benefits due to lack of vesting. 29 U.S.C. § 1001(a). Simpson had the right to request and receive this information under ERISA. 29 U.S.C. §§ 1024(b), 1025(a). Simpson also had a right to request and receive this information independent of Ernst & Young's representation that post-merger retirement benefits would be better than pre-merger retirement benefits.

Ernst & Young contends that information provided to Simpson before the merger satisfied their obligation under §§ 1024(b) and 1025(a) and that the Management Committee's responses provided Simpson with all the information to which he was due. The facts do not support this contention. When Simpson pressed the issue, still having unresolved questions and concerns, the Management Committee Chairman stated that "he did not wish to write further on this subject" and another Management Committee member told him to "call it a day" on the issue. Furthermore, the adequacy of Ernst & Young's response is not determinative of the issue whether Simpson was discharged in retaliation for his inquiries. To hold otherwise would defeat the purpose of § 1140, as it would allow the unscrupulous employer to discharge employees with full impunity so long as the employer adequately responded to the request that triggered the discharge.

The two cases cited by Ernst & Young in support of its position are distinguishable. In *Rush v. McDonald's Corp.*, 966 F.2d 1104 (7th Cir.1992), the plaintiff did not claim that she was discharged because of inquiries as to her retirement benefits. In *Fischer v. Doremus & Co.*, No. 83 C 8214, 1985 WL 9495 (N.D.Ill. Feb. 4, 1985), the employee's "com-

plaints" were found to have no reasonable basis. In the present action, Simpson's inquiries had a reasonable basis. Had they not, they would not have been presented to the Chairman by Management Committee member Schornack.

In view of the above, we find that Simpson was engaged in activity protected by ERISA. We now turn to the issue of whether Simpson's inquiries were a motivating factor in Ernst & Young's discharge decision.

There are several indicia that Simpson was discharged because of his inquiries. All of Simpson's pension inquiries were made before his discharge. Several members of the decision-making body, including Miles, Boland, and Schornack, were aware of Simpson's inquiries at the time they voted to discharge him. At the time of the discharge vote, Miles was aware that Simpson was not vested in any of the retirement plans, except the UBT Account. It is also reasonable to infer that Boland was aware of this fact, because he received Miles' December 1989 letter noting Simpson's vesting date for the Defined Benefit and Retirement Savings Plans. Miles testified that Simpson was the only individual who approached him on this issue. This testimony discounts Ernst & Young's contention that others who inquired, i.e., Hindman and Fritz, were not discharged. There was no evidence that Hindman or Fritz made any direct inquiries on this issue. Schornack testified that others in the same position as Simpson who did not make such inquiries were not discharged, but these people were never identified. Hill testified that he recommended Simpson for discharge due to his unhappiness with the merged firm, as reflected by Simpson's retirement inquiries. The closing paragraph in Miles' December 1989 correspondence suggests that he thought Simpson's inquiries were irksome. Finally, as set forth in Section III *supra*, pp. 819–821, the several reasons advanced by Ernst & Young for Simpson's discharge based on his performance and attitude are pretextual. Taken together, Simpson has shown that it is more likely than not that his inquiries into his retirement benefits was a motivating factor in Ernst & Young's deci-

sion to discharge him. *See Rath,* 978 F.2d at 1090.

## VI. ERISA Does Not Provide For Compensatory Or Punitive Damages

Simpson seeks lost retirement benefits as well as compensatory and punitive damages. In the context of ERISA, compensatory and punitive damages are often referred to as extracontractual damages, not being available under the terms of a benefit plan. *E.g., Gaskell v. Harvard Cooperative Society,* 762 F.Supp. 1539 (D.Mass.1991), *vacated on other grounds,* 3 F.3d 495 (1st Cir. 1993). Ernst & Young contends that Simpson is limited to the relief provided in 29 U.S.C. § 1132(a), which provides only for equitable, not legal, remedies.

There are two sections of § 1132(a) which may apply to Simpson:

> A civil action may be brought by a participant . . . to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B).

> A civil action may be brought by a participant . . . (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3).

The language of § 1132(a)(1)(B) is limited to the recovery of benefits under the terms of the plan. Because none of the retirement plans provide for compensatory or punitive damages, Simpson cannot obtain these damages under § 1132(a)(1)(B). *See Medina v. Anthem Life Insurance Co.,* 983 F.2d 29, 31 (5th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993); *Harsch v. Eisenberg,* 956 F.2d 651 (7th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992); *Reinking v. Philadelphia American Life Insurance Co.,* 910 F.2d 1210 (4th Cir.1990), *overruled in part on other*

*grounds by* Quesinberry v. Life Insurance Co. of North America, 987 F.2d 1017, 1030 (4th Cir.1993) (*en banc*).

The remaining issue is whether extracontractual damages may be awarded as "other appropriate equitable relief" under § 1132(a)(3).

In *Massachusetts Life Insurance Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), the Supreme Court held that a plan fiduciary could not be held personally liable under § 1109 for extracontractual damages caused by improper claims processing. ERISA § 1109 provides that a fiduciary who breaches any of his responsibilities shall be subject to such "other equitable or remedial relief" as the court deems appropriate. Although this language is very similar to "other appropriate equitable relief" language in § 1132(a)(3), because the plaintiff relied on § 1109 and expressly disclaimed reliance on § 1132(a)(3) the Supreme Court said that it had "no occasion to consider whether any other provision of ERISA authorizes recovery of extra-contractual damages." *Russell,* 473 U.S. at 139, n. 5, 105 S.Ct. at 3088, n. 5. Nevertheless, the Court stated that "the six carefully integrated civil enforcement provisions found in § 502(a) ... provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly." Id. at 146, 105 S.Ct. at 3092.

Prior to the decision of the Supreme Court in *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), the United States Courts of Appeals were virtually unanimous that extracontractual damages were not available under § 1132(a)(3). *O'Neil v. GenCorp, Inc.,* 764 F.Supp. 833, 835 (S.D.N.Y.1991) *citing Drinkwater v. Metropolitan Life Insurance Co.,* 846 F.2d 821 (1st Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988); *Powell v. Chesapeake & Potomac Telephone Co. of Virginia,* 780 F.2d 419 (4th Cir.1985), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986); *Sommers Drug Stores Co. Employee Profit Sharing*

*Trust v. Corrigan Enterprises, Inc.,* 793 F.2d 1456, 1465 (5th Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 *and* 479 U.S. 1089, 107 S.Ct. 1298, 94 L.Ed.2d 154 (1987); *Varhola v. Doe,* 820 F.2d 809, 817 (6th Cir.1987); *Kleinhans v. Lisle Savings Profit Sharing Trust,* 810 F.2d 618, 627 (7th Cir.1987); *Sokol v. Bernstein,* 803 F.2d 532, 534 (9th Cir.1986); *United Steelworkers of America v. Connors Steel Co.,* 855 F.2d 1499 (11th Cir.1988), *cert. denied,* 489 U.S. 1096, 109 S.Ct. 1568, 103 L.Ed.2d 935 (1989).

In *Ingersoll–Rand,* which involved a plaintiff seeking extracontractual damages of future lost wages, mental anguish, and punitive damages, the Supreme Court held that ERISA preempted a state common law claim that the plaintiff had been wrongfully discharged to prevent his attainment of benefits under an ERISA plan. 498 U.S. 133, 111 S.Ct. 478. The Supreme Court justified preemption in part on Congress's intent that § 1132(a)[12] provide the exclusive remedy for rights guaranteed under ERISA, including those set forth in § 1140. Id. at 143–144, 111 S.Ct. at 485–486. Drawing an analogy to the broad preemptive force of § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, the Supreme Court noted that federal preemption in ERISA displaces all state law claims, "even when the state action purported to authorize a remedy unavailable under the federal provision." Id. at 144, 111 S.Ct. at 486, *quoting Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 55, 107 S.Ct. 1549, 1557, 95 L.Ed.2d 39 (1987). Thus, although ERISA provides benefits to employees that were lacking at common law, it may also leave potential plaintiffs with less protection in some areas. *See Mertens v. Hewitt Associates,* —— U.S. ——, ——, 113 S.Ct. 2063, 2071, 124 L.Ed.2d 161 (1993).

Simpson contends that the final paragraph in the *Ingersoll–Rand* opinion conclusively establishes that legal remedies, including compensatory and punitive damages, are available under ERISA:

The preceding discussion also responds to the Texas court's attempt to distinguish

---

**12.** Although the Supreme Court specifically addressed § 1132(a)(3) at one point in its opinion, it repeatedly referred to § 1132(a) in general.

this case as not one within ERISA's purview. Not only is § 502(a) the exclusive remedy for vindicating § 510–protected rights, there is no basis in § 502(a)'s language for limiting ERISA actions to only those which seek "pension benefits." It is clear that the relief requested here is well within the power of the federal courts to provide. Consequently, it is no answer to a pre-emption argument that a particular plaintiff is not seeking recovery of pension benefits.

498 U.S. at 145, 111 S.Ct. at 486.

We disagree with Simpson's interpretation. The six extensive and detailed civil enforcement provisions of ERISA, of which § 1132(a)(3) is a part, are strong evidence that Congress did not intend to provide remedies that it did not expressly incorporate. *Russell*, 473 U.S. at 146, 105 S.Ct. at 3092, *cited in Pilot Life*, 481 U.S. at 54, 107 S.Ct. at 1556 *and Ingersoll–Rand*, 498 U.S. at 144, 111 S.Ct. at 485. To be meaningful, the provision for equitable relief must mean something less than all relief. *Mertens*, ── U.S. at ──, 113 S.Ct. at 2063. When Congress intended to afford a legal remedy, such as in ERISA § 1132(g)(2), it expressly provided for "legal or equitable relief." *See Mertens*, ── U.S. at ── ── ──, 113 S.Ct. at 2069–70. *See also Lorillard v. Pons*, 434 U.S. 575, 583, 98 S.Ct. 866, 871, 55 L.Ed.2d 40 (1978). Furthermore, had the Supreme Court in *Ingersoll–Rand* intended to change the law, especially in view of its earlier decisions in *Russell* and *Pilot Life*, it would have done so more explicitly. *Babich v. Unisys Corp.*, Civ.A. No. 92–1473–MLB, 1994 WL 167984 (D.Kan. Apr. 8, 1994); *O'Neil*, 764 F.Supp. 833; *Gaskell*, 762 F.Supp. 1539. *See also Sprague v. General Motors Corp.* 804 F.Supp. 931 (E.D.Mich.1992).

The United States Courts of Appeals that have addressed the *Ingersoll–Rand* paragraph have concluded that § 1132(a)(3) does not provide for extracontractual damages, *Harsch v. Eisenberg*, 956 F.2d 651 (7th Cir. 1992); *McRae v. Seafarers' Welfare Plan*, 920 F.2d 819 (11th Cir.) *reh'g denied*, 931 F.2d 901 (1991), even when the actions involve wrongful discharge and are brought under § 1140. *Spinelli v. Gaughan*, 12 F.3d 853 (9th Cir.1993).[13]

Prior decisions of this Court and the Sixth Circuit support a limitation on § 1132(a)(3) as providing only equitable remedies. In *Miner v. Community Mutual Insurance Co.*, 778 F.Supp. 402 (S.D. Ohio 1991) (Rubin, J.), which involved the right to a jury trial on a claim for breach of fiduciary duty,[14] this Court recognized that *Ingersoll–Rand* had been interpreted by some district courts as establishing that legal remedies, including compensatory and punitive damages for mental anguish, are available under ERISA. *Id.* at 404. Nevertheless, this Court stated that it was bound by the law as interpreted by the Supreme Court and the Sixth Circuit, and found that the plaintiff was limited to an equitable remedy under § 1132 and had no right to a jury trial. *Id.* In *Varhola v. Doe*, 820 F.2d 809 (6th Cir.1987), which involved a § 1140 claim, the Sixth Circuit held that the statutory language and legislative history of § 1132(a)(3) prohibit the recovery of punitive damages, a type of extracontractual damages. 820 F.2d at 817.

The cases cited by Simpson in support of his interpretation of *Ingersoll–Rand*,[15] and other similar cases,[16] were all decided before *Mertens v. Hewitt Associates*, wherein the Supreme Court specifically addressed the meaning of "appropriate equitable relief" under § 1132(a)(3). ── U.S. ──, 113 S.Ct. 2063. In *Mertens*, the Supreme Court held

---

**13.** Some District Courts, however, have concluded § 1132(a) permits extracontractual damages. *See infra*, n. 15.

**14.** The plaintiff in *Miner* alleged a breach of fiduciary duty. The Court interpreted §§ 1132(a)(1)(B) and 1132(a)(3) in order to determine whether a new trial was appropriate.

**15.** *Bittner v. Sadoff & Rudoy Industries*, 490 F.Supp. 534, 536 (E.D.Wis.1980), *Ursic v. Bethle-*

*hem Mines*, 556 F.Supp. 571, 575 (W.D.Pa.), *affirmed in part on other grounds*, 719 F.2d 670 (3rd Cir.1983), *International Union v. Midland Steel Products Co.*, 771 F.Supp. 860 (N.D. Ohio 1991), *McDonald v. Artcraft Electrical Supply Co.*, 774 F.Supp. 29 (D.D.C.1991),

**16.** *Blue Cross & Blue Shield of Alabama v. Lewis*, 753 F.Supp. 345 (N.D.Ala.1990), *Haywood v. Russell Corp.*, 584 So.2d 1291 (Ala.1991).

that this section of ERISA did not authorize suits for money damages against nonfiduciaries who knowingly participated in a fiduciary's breach of fiduciary duty. The Supreme Court acknowledged its earlier *Ingersoll–Rand* decision that a broad interpretation of the ERISA preemption clause may result in less protection for some ERISA plaintiffs. Id. at ——, 113 S.Ct. at 2071. Thus, we interpret *Mertens* to close the door on whatever others may have read into the final paragraph of *Ingersoll–Rand. See Spinelli,* 12 F.3d at 857.

In view of the above, Simpson has no claim for compensatory or punitive damages under either § 1132(a)(1)(B) or § 1132(a)(3).

In light of our finding, it is not necessary to address Ernst & Young's contention that Simpson did not adequately set forth his request for punitive damages in his complaint.

### VII. Simpson's Claim For A Statutory Penalty Is Precluded

At the June 24, 1994 hearing, for the first time in this case, Simpson requested relief under 29 U.S.C. § 1132(c), which provides for a penalty of up to $100 a day against a plan administrator who fails to comply with a participant's request for information. In his complaint, Simpson sought relief under 29 U.S.C. § 1132(a), and specifically cited language from 29 U.S.C. § 1132(a)(1)(B). He did not seek relief under § 1132(c). *Cf. Daniel v. Eaton Corp.,* 839 F.2d 263, 265 (6th Cir.), *cert. denied,* 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988). Although § 1140 expressly states that the "provisions of section 1132 of this title shall be applicable in the enforcement of this section," this does not relieve Simpson of the duty to set forth his claims in his complaint. Nor did Simpson preserve or otherwise raise this claim in the pre-trial order. Under this Court's rule that the parties' claims and contested issues of law shall be set forth in the pre-trial order, this claim cannot now be pursued by Simpson at this stage of the proceeding.

In view of the above, it is not necessary to address Ernst & Young's contention that there is no evidence in the record that the proper party, i.e., the plan administrator, has been named in connection with this claim.

### VIII. Attorney's Fees And Expense Issues Have Been Settled

The Court has been informed by the parties that they have settled the attorney's fees issues with regard to the age discrimination claim. Simpson has not claimed any additional attorney's fees relating to the ERISA claim.

**IT IS THEREFORE ORDERED THAT:**

1) Simpson be awarded ERISA damages in the amount of $712,529. Said damages are not to be added to the jury's age discrimination award, but rather are to be set off against it;

2) Simpson's claims for compensatory and punitive damages are DENIED; and

3) Simpson's 29 U.S.C. § 1132(c) penalty claim is DENIED.