**John M. BELKA**

v.

**ROWE FURNITURE CORPORATION.**

Civ. No. Y–82–3156.

United States District Court, D. Maryland.

Oct. 11, 1983.

---

**1250**

Peter H. Gunst, Baltimore, Md., and Clifford C. Whitney, Baltimore, Md., for plaintiff.

Howard J. Ross, Washington, D.C., and John Henry Lewin, Jr., Baltimore, Md., for defendant.

## MEMORANDUM OPINION AND ORDER

JOSEPH H. YOUNG, District Judge.

If ever there existed a case in which summary judgment was appropriate, this is it. Not only have the parties agreed on every material fact, they are to be commended for having resolved most issues of law, as well. This Court need only determine whether an employee benefit plan was covered by certain provisions of ERISA (the Employees Retirement Income Security Act), in which case the plaintiff claims he is entitled to $100,000 in benefits, or whether the plan is exempted from ERISA's vesting requirements because it is a "plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).

The plaintiff, John M. Belka, began working in 1964 for the Rowe Furniture Co., a Virginia corporation which manufactures and sells furniture. Belka worked as a commissioned salesman. In 1972, the plaintiff entered into a "Deferred Compensation Agreement" with the defendant, which included a clause prohibiting the payment of benefits to an employee who began working in competition with the defendant after leaving the company (the agreement was amended in immaterial ways twice thereafter). The plaintiff left the defendant's employ in late May of 1981, and began working with Seilig Manufacturing Company, which both parties agree is in direct competition with the defendant. The defendant informed the plaintiff that he would forfeit his benefits under the agreement if he continued to work for Seilig. The plaintiff did not stop working for Seilig, and the defendant stopped his benefits.

The plaintiff has not challenged the defendant's determination that he is working for a competing company in violation of the "noncompetition clause," nor has he claimed that the forfeiture clause is invalid on any basis other than that it is prohibited by ERISA. The defendant maintains that benefits were not required to vest with the plaintiff because the plan falls under the ERISA exemption cited above.

Thus, this Court must determine if the Deferred Compensation Agreement executed by the plaintiff and defendant was entered into pursuant to a plan which is: 1) unfunded and 2) maintained primarily for a "select group of management or highly compensated employees."

The parties are separated on other issues as well, including whether the plaintiff was employed for the number of years required for his rights to vest even if the plan is covered by ERISA vesting requirements. However, since this Court determines that the benefits are not required to vest under ERISA, these other issues need not be resolved.

## FUNDING

As stated, the deferred compensation plan for the Rowe Furniture employees will not be subjected to ERISA's vesting requirements if it is both "unfunded" and "maintained ... primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." Thus, the first determination is whether the plan is funded or unfunded within the meaning of the Act.

The parties have agreed on the following facts: Rowe Furniture, the employer, had established Deferred Compensation Agreements with 73 employees by 1978. The company secured insurance policies on the lives of the employees who were covered by

the agreements. These policies, which were specifically mentioned in the agreements (*see* § 12 of the agreement, attached to the plaintiff's motion for summary judgment as exhibits J, L, M, and O), were held by the company in its own name. Premiums were paid directly out of the company's general revenue. The company was the named beneficiary, so that the company would be paid in the event of an insured's death, and benefits would then be paid to the insured's estate out of the company's general revenue. The insurance policy was considered to be an asset of the company. However, if the benefits under such policy were determined to be unpayable "for any reason other than nonpayment of premiums," the Company would assign the policy to the employee's estate or to the employee, and such an assignment would result in a "discharge of any and all obligations accruing to the Company" under the agreement (*see* § 12 of the agreement).

As pointed out by both parties, the ERISA statute, legislative history and regulations (issued by the United States Department of Labor, which is responsible for promulgating ERISA regulations) do not provide much guidance to the Court in its determination whether the specific arrangement here qualifies as being an unfunded plan. Only one court decision, *Dependahl v. Falstaff Brewing Co.,* 491 F.Supp. 1188 (E.D.Mo.1980), appears to address the subject. In *Dependahl,* the employer (the financially troubled Falstaff brewery) secured life insurance policies, which it owned, on the lives of the employees covered by a death benefit policy. There, as here, an employee who had left the company sought to recover benefits from the employer, which maintained that the benefits were not required to vest under ERISA since the plan was "unfunded."

*Dependahl* held that the plan was funded. In doing so, the court relied in part on regulations propounded by the Department of Labor with regard to which plans are covered by the ERISA requirements for disclosure.

29 C.F.R. § 2520.104.20 specifically exempts from the reporting and disclosure requirement employee welfare benefit plans which are maintained by the employer primarily for the purpose of providing benefits to a select group of management and for which benefits are provided exclusively through insurance policies, the premiums for which are paid directly from the employer's general assets. The CBS plan [under consideration in *Dependahl* ] fits squarely within this exemption. The fact that the CBS plan is exempted from this part of ERISA necessarily implies that it is otherwise included within the Act's coverage. 491 F.Supp. at 1195.

While this Court has some doubt that exemption of a specific type of plan from some of the requirements of ERISA "necessarily implies" that the plan is covered by ERISA's other requirements, the *Dependahl* court proceeded in its analysis.

This regulation, along with others, also seems to equate "unfunded" with payment of benefits from the employer's general assets. See also, for example, 29 C.F.R. 2520.104–20. This correlation is entirely reasonable. In the case of CBS plan, for example, the benefits will eventually be paid through the insurance contracts purchased and maintained by payments by Falstaff. *Id.*

This section of the District Court's decision was affirmed by the Eighth Circuit Court of Appeals.

We agree with the District Court's conclusion that the plan was funded. Funding implies the existence of a *res* separate from the ordinary assets of the corporation. All whole-life insurance policies which have a cash value with premiums paid in part by corporate contributions to an insurance firm are funded plans. The employee may look to a *res* separate from the corporation in the event the contingency occurs which triggers the liability of the plan. *Dependahl v. Falstaff Brewing Co.,* 653 F.2d 1208, 1214 (8th Cir.1981).

This Court agrees with the Eighth Circuit that the distinction between funded and

unfunded plans is whether there is a separate *res* set apart from the company's general funds. Presumably, the Eighth Circuit also concluded that life insurance policies, even when owned by the employer, constitute such a "res" when the policies fund the payment of *death* benefits. It is worth noting, however, that in *Dependahl* the benefits were payable only upon the death of the employee, and the insurance policies would certainly assist in paying—if not completely funding—the benefits due. Under the Rowe Furniture plan, however, the life insurance would fund the employer's liability only in rare situations. The insurance policies would pay only upon the death of the employee, but, under the terms of the agreement, in many if not most instances, the "deterred compensation" benefits would be payable to the employee upon his separation from the company. If the employee retires or is discharged and is able to collect under the agreement, the benefits would have to be paid out of the company's general revenues, at least until the employee's death. Therefore, in the ordinary case, the payment of the benefits to an employee covered by a Deferred Compensation Agreement would be made out of the employer's general assets.

Furthermore, the Rowe agreement specifically provided that the employee or his designee shall have "no rights with respect to, or claim against, such policy," except as provided in the insurance policy itself. This distinguishes *Dependahl* where the Eighth Circuit noted that one basis of its finding with regard to the Falstaff plan was that the employee's estate could look to the *res* separate from the corporation if a covered employee died and the company would not pay the benefits.

Therefore, the Rowe Furniture Deferred Compensation Agreements must be considered to have been made pursuant to an "unfunded" plan.

PRIMARY PURPOSE

Having determined that the plan was "unfunded" for the purposes of ERISA's vesting requirements, the Court must proceed to analyze whether the plan meets the second of the ERISA exemption tests, that is, whether the plan was primarily created for a "select group" of highly compensated or management employees.

The program which provided employees with deferred compensation agreements began in 1972 with about 20 employees, most of them commissioned salesman, like the plaintiff. In 1981, 73 of Rowe's present and former employees were covered by the Agreements. The 73 employees include salesman and a diverse group of executives, including vice presidents, sales managers, supervisors. *According to information supplied by the employer and not disputed by the plaintiff, between 1.6 percent of the defendant's work force in 1972 and 4.6 percent of its work force in 1980 were covered by the agreements.* The average salary of those individuals covered by deferred compensation agreements in 1972 was more than $40,000 a year, compared with an average salary for company employees of $9,195. The average salary of those covered by the agreements in 1980 was nearly $55,000, compared to the company-wide average of less than $16,000. Particularly important is the fact that out of the 73 employees covered by deferred compensation plans in 1978, only seven were making less than $25,000 annually (or had been making that much when they retired), compared to the average company-wide salary of $13,000. And those seven individuals were all in management positions—specifically: order processing manager, assistant general manager, director of purchasing and personnel, assistant controller, fleet equipment manager, and assistant director of manufacturing.

The plaintiff seeks to establish that the covered employees were not all part of a "select group of management or highly compensated employees" by pointing out that the salesmen were not managers and a number of the other individuals were not highly compensated. However, the statute provides an exemption to those plans which are "primarily" designed for those individuals who are *either* management or highly compensated. It is difficult to know, with-

out guidance of courts or the Department of Labor, what standards to apply in determining whether all the individuals are highly compensated or in managerial positions. But one commentary suggests that the courts should apply the same standard applied by the Internal Revenue Service under the tax code. One such provision specifies that highly compensated individuals are considered to be the highest paid 25 percent of all employees. Goodman and Stone, *Exempt Compensation Arrangements under ERISA*, 28 Cath.U.L.Rev. 445, 463–464 (1979). Under such a standard, almost all of Rowe employees covered by the agreements would fit within the "select group."

The plaintiff further seeks to attack the figures presented by the defendant by noting that the high average salary of recipients of the agreements in 1973 ($38,319) may have been skewed by the very high salaries of the top-ranking officers on the list. Nevertheless, the *median* salary among the 73 employees (a figure which would compensate for the very high executive salaries) was more than $33,000 per year, a very substantial sum compared to the average salary for company employees of $10,612.

The Goodman and Stone article cited above noted that a Labor Department official, whose oral opinion, although not controlling, provides some guidance to the Court, suggested possible tests to be used in determining whether a group was composed of highly paid or management employees. His suggested analyses included a "facts and circumstances" test, a straight-dollar approach, a functional and dollar test, a percentage test, a percentage test with a dollar floor, and a densest mass test. *Id.* at 464. Under any of these tests, it would appear that those individuals covered by Rowe's agreements were a "select group" of highly paid or executive-level employees. The article also states that the Department of Labor has focused—in its opinion letters—on the size of the targeted group and its salary, in relation to other employees. *Id.* Again, Rowe's plan would be exempt under such an analysis.

Accordingly, this Court finds that the defendant's Deferred Compensation Agreements were established primarily for a group of highly paid or management-level employees, and because the plan is unfunded within the meaning of the Act, the agreements were not required to meet the vesting requirements of ERISA. Since ERISA's vesting requirements do not apply, it is not necessary for the Court to decide whether the agreement's provisions with respect to vesting would have to be amended by a court to meet the terms of ERISA.

For the reasons set forth herein, it is this 11th day of October, 1983, by the United States District Court for the District of Maryland, ORDERED:

1. That defendant's motion for summary judgment BE, and the same IS, hereby GRANTED; and

2. That copies of this Memorandum and Order be sent to counsel for the parties.