**Donald E. BELSKY, Plaintiff,**

v.

**FIRST NATIONAL LIFE INSURANCE COMPANY, A Nebraska Corporation; and the Federal Deposit Insurance Corporation, Defendants.**

**CV85–L–406.**

United States District Court,
D. Nebraska.

May 5, 1986.

Gary Dolan of Knudsen, Berkheimer, Richardson & Endacott, Lincoln, Neb., for plaintiff.

John H. Bernstein of Dixon, Dixon & Minaham, P.C., Omaha, Neb., and William D. Kuester, Lincoln, Neb., for defendants.

## MEMORANDUM DECISION

URBOM, District Judge.

A nonjury trial was held on April 17–18, 1986. The following uncontroverted facts are set out in the pretrial order. The plaintiff, Donald Eugene Belsky, had worked for the Bank of Cody from July of 1971 until it was closed by the Nebraska Department of Banking and Finance on October 24, 1984. Belsky became President of the Bank in 1975, a director in about 1977, and remained in those positions until the closing of the Bank. See Filing 24. On February 1, 1982, Belsky signed and submitted an application to the First National Life Insurance Company of the U.S.A. for life insurance in the amount of $250,000. Exhibit 3. On March 2, 1982, First National Life issued policy number 20030 on the life of Belsky. Exhibit 4. On or about that date, the Bank paid the initial premium on that policy. The coverage of this policy was increased to $350,000 in September of 1983 and increased to $525,000 in May of 1984. The Bank paid the increased premiums for these increases. On March 2, 1982, and May 8, 1984, Belsky signed salary continuance agreements with the Bank. Exhibits 1 and 11.

The FDIC, as receiver, sold some of the assets of the closed Bank to Guardian State Bank and Trust. The assets not purchased by Guardian were acquired by the FDIC in its corporate capacity as authorized by 12 U.S.C. § 1823(c)(2)(A). Among the assets so acquired were whatever rights, title or interest the Bank of Cody had in the insurance policy mentioned above. The policy itself provides that the owner of the policy is the Bank and that the beneficiary is named in the application. Exhibit 4. The application states that the beneficiary of the policy is the Bank. Exhibit 3.

Paragraph three of the salary continuance agreement provides that if Belsky worked continuously for the Bank until after his 55th birthday, and if the agreement was still in effect, the Bank would pay monthly retirement benefits to him. Paragraph 10 concerns the creditor status of Belsky. It states:

> "The rights of the Executive or any beneficiary of the Executive shall be solely those of an unsecured creditor of the Bank. If the Bank shall acquire an insurance policy or any other asset in connection with the liabilities assumed by it hereunder, then, except as otherwise expressly provided, such policy or other asset shall not be deemed to be held under any trust for the benefit of the Executive or his/her beneficiary or to be collateral security for the performance of the obligations of the Bank, but shall be, and remain, a general, unpledged, unrestricted asset of the Bank."

Exhibits 1 and 11.

According to the evidence, salary continuance agreements were signed with most, if not all, of the Bank's officers and life insurance policies were purchased by the Bank on the officers' lives. The Bank was the owner, beneficiary and payor of all premiums on the policies.

James C. Bishop is the person within First National Life Insurance Company who was primarily responsible for the Bank's account up through obtaining the initial applications for life insurance and presenting sample salary continuance agreements to the parties to the agreements. Bishop testified that the Bank would purchase and own the life insurance polices on various individuals. The Bank would then enter into side-agreements (the salary continuance agreements) with the officers for future payments. Exhibit 16, the Executive Compensation Plan for the Bank of Cody, was prepared by First National Life. According to the plan, the expense of benefits paid by the Bank pursuant to the salary continuance agreements could be recouped from the cash value of the policies. The policies were set up to cover the entire cost of the salary continuance agreement. Bishop never inquired whether the Bank had other resources to fund the salary continuance agreements.

Bishop also testified that he told Belsky before accepting his application for insurance that the Bank had a liability to Belsky under the salary continuance agreement, that the Bank would be obligated to pay Belsky upon retirement, and that death benefits would be paid by the Bank. It was within the discretion of the Bank to decide whether withdrawals were to be made from the cash value of the policy to recoup the expense of making the retirement payments. The Bank could pay the benefits without calling on the cash value of the policies. Both Bishop and Wayne Wilson, Vice President of First National Life, testified that if the Bank had requested the cash surrender value of the policy First National Life would have paid it.

Raymond Weilage testified that he and others purchased the Bank in 1977 and that he also had an interest in the holding company of the Bank. In 1981 and 1982 he was a director of the Bank and president of the holding company. He was at a bank managers' meeting in Denver when representatives of First National Life presented its executive compensation plan. Weilage recalled that the plan presented called for the Bank to purchase life insurance policies on its covered employees. There would be separate agreements between the Bank and the employees which would obligate the Bank to make retirement payments to eligible employees. He understood that the Bank could make withdrawals from the cash surrender value of the policies. He stated that he thought the retirement plan for the employees was irrevocable. He knew that neither the salary continuance agreement with Belsky nor the insurance policy stated they were irrevocable but maintains that it was the expressed oral intention of the owners that it be irrevocable. He stated that he understood that the insurance policies were to be used only for retirement or death benefits for the employees.

First National Life's Executive Compensation Plan was presented at the Denver bank managers' meeting in the form of a pamphlet. Exhibit 15. Exhibit 16 contains the identical information plus two examples of benefits for Belsky. James Bishop presented this exhibit to Belsky at the Bank in January of 1982. In both exhibits, the operation of the plan is described as follows:

"The Bank will enter into an Agreement with each selected Employee. This agreement will provide that retirement benefits will be paid to the Employee. Should the Employee die prematurely, the Employee's family will receive certain payments. To informally fund the benefits, the Bank will be the owner, applicant, premium payor and beneficiary of a life insurance contract."

Both exhibits also provide that upon retirement, "[t]he retired Employee will be paid benefits out of the operating income of the Bank which are tax deductible." Exhibits 15 and 16. Belsky stated that Bishop did not discuss how he could lose such benefits. Janice Lallman, another Bank employee, stated that Bishop told her the only way she could lose her similar retirement benefits was to quit working for the Bank.

## FUNDING

The plaintiff states in his brief that the plan in this case may be an "excess benefit plan." Excess benefit plans as defined by 29 U.S.C. § 1002(36) are exempted from ERISA coverage if they are unfunded. 29 U.S.C. § 1003. Unfunded plans which are "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of highly compensated employees" are also exempt from ERISA coverage concerning participation and vesting, funding and fiduciary responsibility. 29 U.S.C. §§ 1051, 1081 and 1101. The FDIC argues that First National Life's Executive Compensation Plan is unfunded and ERISA does not apply even if it is a plan as defined by ERISA. Two cases are pivotal in determining whether the plan is funded, *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208 (8th Cir.), cert. denied, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981); and *Belka v. Rowe Furniture Corp.*, 571 F.Supp. 1249 (D.Md.1983). In

*Dependahl,* Falstaff instituted a Contractual Benefit Plan for Survivors of Selected Executives, under the terms of which the named beneficiaries of an executive were to receive an annuity upon the executive's death. Falstaff purchased whole life insurance policies on approximately one dozen high ranking executives to fund the plan. The Eighth Circuit agreed that the plan was funded under ERISA.

"Funding implies the existence of a res separate from the ordinary assets of the corporation. All whole life insurance policies which have a cash value with premiums paid in part by corporate contributions to an insurance firm are funded plans. The employee may look to a res separate from the corporation in the event the contingency occurs which triggers the liability of the plan."

*Dependahl v. Falstaff Brewing Corp.,* supra, at 1214.

The FDIC argues that the factual situation in *Belka* is much closer to the factual situation of the plaintiff and should control on the determination of funding. In *Belka,* the plan provided that an employee "shall have 'no rights with respect to, or claim against, such policy,' except as provided in the insurance policy itself." *Belka v. Rowe Furniture Corp.,* supra, at 1252. The *Belka* court found this provision distinguished the case from *Dependahl* where the employee's estate could look to a res separate from the company in the event that the company would not pay the benefits. *Id.* In *Belka* the life insurance policies purchased by the company would fund the payments to the employees only in rare instances, when the employee died. Upon retirement or discharge, the company would pay covered employees "out of the company's general revenues, at least until the employee's death." *Id.,* at 1252.

The FDIC interprets paragraph ten of of the salary continuance agreement as showing that neither Belsky nor the Bank contemplated that the insurance policy constituted a separate res to which Belsky could look if the Bank failed to fulfill its obligations to him under the salary continu-

ance agreement. The Eleventh Circuit has stated that the purchase of insurance does not necessarily establish a funded plan; it is merely evidence that a plan, fund, or program has been established. *Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir.1982) (en banc).

"In summary, a 'plan, fund, or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits."

*Id.*

Joseph A. Kertchmark, a field office supervisor and bank examiner for the Department of Bank Supervision of the FDIC, participated in the March 1984 examination of the Bank and was the examiner in charge of the August 1984 examination. He became aware of the salary continuance agreements and insurance policies during the March examination. Kertchmark found no documentation tying the two together. He stated that the FDIC viewed the policies as general assets of the Bank and the salary continuance agreements as liabilities of the Bank.

■ Belsky points out that death benefits in the case sub judice are funded in the same way as death benefits in the *Dependahl* case. The employer purchased and owned life insurance policies on the employees. Death benefits payable to the employer were then available to pay death benefits under separate agreements with the employee. The fact that retirement benefits in the instant case were intended to be financed by withdrawals from the cash value of the policies does not, in Belsky's opinion, distinguish the plan from the funded plan in *Dependahl.* According to Belsky, the *Belka* court misunderstood *Dependahl* when attempting to distinguish the plans based upon the provision in the *Belka* agreement that the employee shall have no right or claim against the policy except as provided in the insurance policy itself. I disagree, paragraph 10 does distinguish the salary continuance agreement

from the *Dependahl* case. Paragraph 10 shows that the parties did not interpret the policy as creating a separate res to which Belsky could look if the Bank failed to pay the promised retirement benefits. The executive compensation plan in the case sub judice is unfunded and ERISA does not apply. *Belka v. Rowe Furniture Corp.*, supra.

Belsky also argues that exclusionary language in an agreement should not be determinative of whether a plan is funded since such language may be unenforceable under ERISA. *Bruchac v. Universal Cab Co.*, 580 F.Supp. 295 (N.D.Ohio 1984); *Winer v. Edison Brothers Stores Pension Plan*, 593 F.2d 307 (8th Cir.1979). These cases are inapposite in that they do not deal with the issue of funding of a plan. The first concerns the nonforfeitability of vested benefits under 29 U.S.C. § 1053 and the second the enforceability of "bad boy" clauses after the enactment of ERISA.

### 12 U.S.C. § 1823(e)

Section 1823(e) of Title 12 of the United States Code provides that agreements which tend to diminish or defeat the right, title, or interest of the FDIC, in its corporate capacity, in any of the assets that it has acquired by purchase must meet four conditions. The third requirement is that the agreement "shall have been approved by the Board of Directors of the Bank or its loan committee, which approval shall be reflected in the minutes of said Board or committee." If Belsky were awarded the policy it would diminish the FDIC's corporate interest in that asset. The salary continuance agreement falls within § 1823(e). The minutes of the Board of Directors of the Bank do not reflect that the salary continuance agreement of Belsky was approved by the Board. The agreement is therefore not enforceable against the FDIC in its corporate capacity.

Only two references to an employee benefit plan are contained in the minutes of the meetings of the board of directors of the Bank. The August 20, 1983, minutes state: "A motion by D.E. Belsky and sec-onded by Raymond L. Weilage, Jr. to increase the asset account of Employee Benefit Fund by $90,000 to $100,000. Motion carried." Exhibit 20. The May 25, 1984, minutes state:

"A motion by Janice M. Lallman and seconded by Delbert D. Fullerton to delete Raymond L. Weilage, Jr. and James D. Peters from the Employee Benefit Program through First National Life Insurance Company of USA. The adjusted balance is $12,730.37 and represents the adjusted difference between the current program and the deletion of Mr. Peters and Mr. Weilage. The motion carried on a unanimous ballot, with Mr. Weilage abstaining from the voting."

In interpreting the approval requirement, one court has stated that: "[t]he side agreement itself must be referenced or its existence must be affirmatively and directly acknowledged by the Bank's board of directors or loan committee, and such reference to, or acknowledgement of the side agreement must be specifically reflected in the minutes of the board or committee." *FDIC v. Gardner*, 606 F.Supp. 1484, 1488 (S.D.Miss.1985). This requirement has not been met. Approval of the salary continuance agreement is not reflected in the entries quoted above.

Plaintiff's counsel argues that the purpose of this requirement is to show that the issue was before the board and because some of the directors testified that they had approved of the agreements this purpose has been met. I disagree. The relevant public policy here is the policy behind the creation of the FDIC, i.e., promoting stability and confidence in the nation's banking industry. *Gunter v. Hutcheson*, 674 F.2d 862, 870 (11th Cir.1982), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), (and cases cited therein). In *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 459–60, 62 S.Ct. 676, 680–81, 86 L.Ed. 956 (1942), the Supreme Court held that an agreement designed or having the effect of deceiving creditors or a public authority could not be a defense against the FDIC collecting on a note in its corporate capaci-

ty. Section 1823(e) is generally considered to reflect congressional codification of the holding of *D'Oench, Duhme.* This policy allows the FDIC to take assume that documents are what they appear to be on their face. In this case the FDIC possesses an insurance policy. The salary continuance agreement provides that the policy is a general, unrestricted asset of the Bank. The FDIC can rely upon these documents and Belsky cannot alter them by introducing extrinsic evidence that they are other than as purported on the documents themselves unless the requirements of § 1823(e) are met. The express provisions of § 1823 must be followed. *FDIC v. Vogel,* 437 F.Supp. 660, 663 (E.D.Wis.1977).

Whether the FDIC had notice of the agreement, or whether Belsky and the Bank entered into the agreement in good faith is immaterial under § 1823. In *FDIC v. First Mortgage Investors,* 485 F.Supp. 445 (E.D.Wis.1980), a borrower had sued the bank on an asserted oral agreement between himself and bank officers that he could pay only the interest on a loan until his financial situation improved. The court held that even though the borrower had filed suit before the bank was closed, and the FDIC had knowledge of the suit before it took over the assets of the bank, the asserted oral agreement was not valid against the FDIC under § 1823(e).

ERISA does not preempt federal law except as provided in the Act. 29 U.S.C. § 1144(d). Federal banking law is not preempted by ERISA, therefore, § 1823(e) is unaffected by ERISA.

Belsky's arguments that § 1823 does not apply in the instant case are unpersuasive. He argues first that the policy was an asset of the retirement plan and not the bank—the policy itself indicates the owner is the Bank. The Bank is not designated as the administrator of a pension plan. Furthermore, representatives of First National Life testified that the Bank could withdraw money and cash in the policy. Second, he argues that this section is meant to to prevent the enforceability of oral agreements not reflected in the official doc-uments of the bank. The section, by its terms, however, applies to written as well as oral agreements. *FDIC v. Gardner,* supra; *FDIC v. De Jesus Velez,* 678 F.2d 371 (1st Cir.1982) (all conditions of 1823(e) must be met).

Belsky's third argument is that *Howell v. Continental Credit Corp.,* 655 F.2d 743 (7th Cir.1981), prevents the FDIC from invoking the protection of this section. *Howell* stands for the proposition that when the FDIC is attempting to recover on an asset which is *"the very same agreement* that the makers claim has been breached by the FDIC's assignors, § 1823(e) does not apply." *Id.,* at 747, quoting *Riverside Park Realty Co. v. FDIC,* 465 F.Supp. 305, 313 (M.D.Tenn. 1978) (emphasis in original). In *Howell,* the FDIC was attempting to collect on leases which the lessee claimed were invalid because the lessor had failed to obtain ownership of the equipment which was to be leased. The court stated that it was not a case where the lessee was asserting a secret agreement that made the leases invalid. The defenses of the lessee arose directly from the provisions of the leases which were in the bank's files. In the instant case, the FDIC is not seeking to enforce the salary continuance agreement. The FDIC asserts 1) that the salary continuance agreement is not valid against it under § 1823(e), and 2) if it is valid, paragraph 10 shows the parties intended the plan to be unfunded. *Howell* does not prevent the FDIC from asserting these defenses to the plaintiff's claim that the FDIC does not have a right to the insurance policy.

## MISCELLANEOUS

There are a few other issues that I need not decide because of my conclusions that the salary continuance agreement is not covered by ERISA and that the FDIC is entitled to the policy under 12 U.S.C. § 1823(e).

The salary continuance agreement required Belsky to work for the Bank up to his 55th birthday in order to obtain retirement benefits. There is no question that

**86**

he did not do so; the Bank was closed some eight months before he turned 55. Belsky argues that upon the closing of the Bank, the plan terminated. Upon termination, the plan assets must be allocated in compliance with the six categories of priority in 29 U.S.C. § 1344. A companion Department of Labor regulation, 29 C.F.R. § 2618.16 provides that § 1344(a)(6) benefits "are all of the participant's benefits under the plan, whether forfeitable or nonforfeitable." Belsky argues that these provisions are tantamount to complete vesting of all benefits upon plan termination and that he is therefore entitled to the insurance policy. Because the plan was not within the ambit of ERISA, this section does not apply.

Because I have ruled in favor of the FDIC on other grounds I need not discuss the issue of whether Belsky breached any fiduciary duties or the effect of an alleged breach upon his right to receive retirement benefits.

For the same reason, I need not decide the effect of § 8–1,110, R.R.S.Neb. (Reissue 1983), which provides that depositors' claims to the assets of an insolvent bank shall have priority over all other claims except claims for taxes, on the claims to the policy.

## CONCLUSION

The plaintiff has failed to prove that he has a right to First National Life Insurance policy No. 20030. The injunctive relief requested by the plaintiff will be denied. Judgment in this case will be entered for the defendant FDIC.