Ernest M. FLEISCHER, Plaintiff,

v.

RESOLUTION TRUST CORPORATION, Receiver of Franklin Savings Association, Defendant.

John A. SCOWCROFT, Plaintiff,

v.

RESOLUTION TRUST CORPORATION, Receiver of Franklin Savings Association, Defendant.

Civ. A. No. 92–4018–DES. No. 92–4019–DES.

United States District Court, D. Kansas.

March 31, 1995.

Nicholas L. DiVita, Matthew V. Bartle, Carol B. Clark, Lisa J. Henoch, Bryan Cave, Kansas City, MO, Robert M. Thompson, Rouse, Hendricks, German, May & Shank, Kansas City, MO, for Ernest M. Fleischer.

Cynthia C. Dunham, Emily Jane Bailey, Steven M. Leigh, Martin, Leigh & Laws, Kansas City, MO, Kimberly S. Hughes, Law Office of John P. Ryan, Jr., Grandview, MO, Cynthia Clark Campbell, The Campbell Law Firm, Kansas City, MO, J. Mark Baird, James F. Duncan, Robert B. Best, Jr., Watson & Marshall L.C., Kansas City, MO, for Resolution Trust Corp. in Civ. A. No. 92–4018–DES.

Kimberly S. Hughes, Law Office of John P. Ryan, Jr., Grandview, MO, Cynthia Clark Campbell, The Campbell Law Firm, J. Mark Baird, James F. Duncan, Robert B. Best, Jr., Watson & Marshall L.C., Kansas City, MO,

for Franklin Sav. Ass'n in Civ. A. No. 92–4018–DES.

Nicholas L. DiVita, Carol B. Clark, Lisa J. Henoch, Bryan Cave, Robert M. Thompson, Rouse, Hendricks, German, May & Shank, Kansas City, MO, for John A. Scowcroft.

Steven M. Leigh, Martin, Leigh & Laws, Kansas City, MO, Kimberly S. Hughes, Law Office of John P. Ryan, Jr., Grandview, MO, Cynthia Clark Campbell, The Campbell Law Firm, Kansas City, MO, Susan Ellmaker, Overland Park, KS, J. Mark Baird, James F. Duncan, Watson & Marshall L.C., Kansas City, MO, for Resolution Trust Corp. in No. 92–4019–DES.

Kimberly S. Hughes, Law Office of John P. Ryan, Jr., Grandview, MO, Cynthia Clark Campbell, The Campbell Law Firm, Kansas City, MO, Susan Ellmaker, Overland Park, KS, J. Mark Baird, James F. Duncan, Watson & Marshall L.C., Kansas City, MO, for Franklin Sav. Ass'n in No. 92–4019–DES.

## MEMORANDUM AND ORDER

SAFFELS, Senior District Judge.

### I. INTRODUCTION

This matter is before the court on the Resolution Trust Corporation's ("RTC") motion for partial summary judgment (Doc. 145). Ernest Fleischer ("Fleischer") and John Scowcroft ("Scowcroft") are former members of the Board of Directors of Franklin Savings Association ("FSA"). They contend that the RTC, as conservator of FSA, breached their employment contracts. They seek post-conservatorship and severance pay. Scowcroft also seeks relocation expenses pursuant to a pre-conservatorship agreement.

### II. SUMMARY JUDGMENT STANDARDS

 A court shall render summary judgment upon a showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The rule provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of

material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The substantive law identifies which issues are material. *Id.* at 248, 106 S.Ct. at 2510. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmovant. *Id.* "Only disputes over facts that might properly affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

 The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos National Laboratory*, 992 F.2d 1033, 1036 (10th Cir.1993). The movant may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the [nonmovant's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. at 2553.

 Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). The nonmovant must go beyond the pleadings and, by affidavits or the depositions, answers to the interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (interpreting Rule 56(e)). Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Id.* at 322, 106 S.Ct. at 2552. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. at 2553.

 A court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the

evidence. *See, e.g., United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986) (stating that "[t]he court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues"). The court's function is not to weigh the evidence, but merely to determine whether there is sufficient evidence favoring the nonmovant for a finder of fact to return a verdict in that party's favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Id.* at 250, 106 S.Ct. at 2511.

## III. *FACTUAL BACKGROUND*

The Factual Background heading of the instant Memorandum and Order is divided into two subheadings. The first subheading sets forth the facts relevant to plaintiffs' claims for post-conservatorship and severance pay. The second subheading sets forth the facts relevant to Scowcroft's claim for his relocation expenses.

For the purposes of the RTC's motion for partial summary judgment, the following facts are either uncontroverted or construed in the light most favorable to plaintiffs.

### A. *Post–Conservatorship and Severance Pay*

FSA is a state chartered, stock savings and loan association engaged in business in the state of Kansas. Fleischer was Chairman of the Board of Directors of FSA and Scowcroft was Vice Chairman. Fleischer's annual salary was $500,000.00, plus fringe benefits. Scowcroft's annual salary was $250,000.00, plus fringe benefits. Neither Fleischer nor Scowcroft had an integrated written employment contract with FSA.

At some time prior to February 15, 1990, the Board of Directors of FSA instructed Fleischer and Scowcroft to challenge the Office of Thrift Supervision ("OTS") should it impose a conservatorship. On February 15, 1990, the Director of the OTS determined FSA was unsafe and unsound. As a result, the Director appointed the RTC as FSA's

conservator. On February 16, 1990, John L. Carr ("Carr") was appointed Managing Agent of the conservatorship. Charles P. Farrell, Jr. replaced Carr as Managing Agent August 13, 1990. Farrell served as Managing Agent until February 13, 1992. Neither the Director of the OTS nor either of the Managing Agents of FSA ever issued an express determination that plaintiffs' employment was necessary for the continued operation of FSA.

On February 16, 1990, the day after the conservatorship was imposed, Carr, as Managing Agent, sent the following letter to both plaintiffs:

> This letter is to inform you that the Office of Thrift Supervision ("OTS") has determined that Franklin Savings Association is insolvent, and on February 16, 1990, appointed the Resolution Trust Corporation ("RTC") as Conservator. The business of the Association will continue without interruption under the direction of the RTC as Conservator.
>
> It is our understanding that you have served as a director of the Association from time to time, and that you may have records or other property of the Association in your possession. You are hereby requested to deliver to the Conservator, at the office of the Association at 1890 Benson, Overland Park, Kansas 66210, all assets and property of any kind now in your possession or control that belong or belonged to the Association. Your immediate attention and compliance with this request is required by law. I look forward to your cooperation. If you have any questions please feel free to consult with me.

On February 23, 1990, the RTC removed plaintiffs from FSA's pay roll by placing them on unpaid leaves of absence retroactive to February 16, 1990.[1]

In March 1990, Gwendolyn Black, an Administrative Assistant with the RTC, prepared and submitted a "case" requesting au-

---

1. Apparently, more than 17 months passed before either plaintiff claimed any right to salary or benefits or made any inquiry to the OTS, the RTC, or FSA about why he was not receiving his salary or benefits.

thority to terminate Fleischer.[2] In the "case" she noted that "[Fleischer] has remained a very vocal individual even after being placed on leave." She concluded that "it is believed prudent to remove Mr. Fleischer from his position as Chairman of the Association as soon as possible particularly when he appears to be establishing grounds for future litigious actions with regard to the RTC." On March 12, 1990, FSA commenced litigation against the OTS challenging the imposition of the conservatorship.

On May 2, 1990, Beverly Johnston, FSA's Human Resources Director, sent identical letters to both plaintiffs in which she informed them as follows: "[d]ue to your leave of absence status beginning February 16, 1990, your company paid insurance benefits will continue through May 31, 1990. After that date you have the right under COBRA to continue health care and dental coverage at group rates, but at your own expense."[3] She also enclosed COBRA applications. Both plaintiffs completed and submitted the applications.

FSA prepared a Form 10–K, pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the fiscal year ending June 30, 1990. The Form 10–K reads, in part, as follows: "[s]ince the commencement of the conservatorship the employment of several persons by Franklin has terminated. These people include Ernest M. Fleischer, Chairman of the Board [and] John A. Scowcroft, Vice Chairman of the Board. . . ." The Form 10–K later reiterates as follows: "Ernest M. Fleischer and John A. Scowcroft ceased to be employees of the Association a few days after the Conservator's appointment."

FSA periodically prepared alphabetical lists of its employees. Each list contained basic information, such as the following: name, employee number, department number, title, compensation, date hired, and date terminated. Both plaintiffs' names appear on each list FSA prepared from February 16,

1990, through July 14, 1993. None of the lists for this period show a termination date for either plaintiff.

On February 15, 1990, the date the conservatorship was imposed, FSA had the following severance pay policy:

I. *Policy Statement*

Franklin Savings Association will grant severance pay in exchange for a release of all claims to all full-time employees whose jobs are terminated due to lay-offs. Severance pay is calculated as two weeks for each year or partial year of service. Severance is based on rate of pay at the time of termination and average hours worked over the past 52 weeks up to a maximum of 40 hours per week. It is the intent of the Association to facilitate re-employment without substantial financial loss.

II. *Responsibility*

The authorization of severance pay for an employee must be initiated by the employee's manager and approved by the Division Head and Senior Management.

III. *Procedures*

1. To be eligible for severance pay, termination must be based upon reduction of the work force.

. . . . .

The severance pay policy was revised in July 1990, to include a four month cap on benefits.

**B. *Relocation Expenses***

Prior to February 15, 1990, FSA's policy regarding reimbursement of relocation expenses provided as follows:

I. *Policy Statement*

It is the policy of Franklin Savings Association to provide relocation assistance to current employees who are asked to relocate and to certain new hires who are relocating to join the company.

II. *Responsibility*

It is the responsibility of the hiring manager in consultation with his or her division head to negotiate relocation expenses at

---

2. A "case" is a procedure used by the RTC's personnel to request authority to take specific action.

3. Even though they had not been receiving their salaries, plaintiffs contend they were unaware they had been placed on unpaid leaves of absence until they received the May 2, 1990, correspondence.

the time of the job offer in accordance with the grade-level guidelines. The Human Resources staff should also be consulted to insure consistency in the implementation of the policy. Relocation expenses are charged to the hiring department.

III. *Procedures*

1. All expenses must be pre-approved by the hiring manager and the Director of Human Resources. A letter is forwarded by Human Resources to the newly hired, transferred, or promoted employee outlining in detail expenses to be covered.

2. All invoices are submitted on Franklin Savings Association's Recruitment and Relocation expense report form (PER–55). The employee's supervisor must approve prior to submitting to Human Resources.

. . . . .

Scowcroft relocated from Connecticut to accept employment with FSA. On or before December 12, 1989, Scowcroft submitted a request for $69,291.71 in relocation expenses, $43,838.71 of which was for maintenance of his house in Connecticut. On February 14, 1990, the day before the Director of OTS determined FSA to be "unsafe and unsound," Fleischer approved Scowcroft's requested expenses in toto. It is unclear whether the Director of Human Resources authorized the $43,838.71 Scowcroft incurred to maintain his house in Connecticut.

## IV. *DISCUSSION*

The instant action arises out of several alleged breaches of plaintiffs' employment contracts and, more specifically, involves the following three claims: (1) Fleischer and Scowcroft's claim for compensation from the date the conservatorship was imposed to the date they were terminated; (2) Fleischer and Scowcroft's claim for severance pay because

of their termination; and (3) Scowcroft's claim for relocation expenses. The RTC moves for summary judgment as to all of claims one and two and a portion of claim three.

### A. *Post–Conservatorship Compensation*

Plaintiffs contend their employment contracts survived the imposition of the conservatorship. They further contend they are entitled under their contracts to compensation for services rendered post-conservatorship. Specifically, they contend they are entitled to compensation because, pursuant to a directive issued pre-conservatorship by the Board of Directors of FSA, they initiated and prosecuted a suit challenging the legality of the conservatorship. They also seem to contend they are entitled to compensation because they assisted the RTC during the transition.

Section 1821(e), Title 12, United States Code, authorizes the RTC to disaffirm or repudiate the contracts of a failed savings association.[4] The RTC moves for summary judgment arguing, essentially, as follows: (1) plaintiffs are not entitled to post-conservatorship compensation because their contracts effectively were repudiated February 15, 1990, the date the conservatorship was imposed, when they terminated by operation of 12 C.F.R. § 563.39(b)(5)(ii); and (2) even if 12 C.F.R. § 563.39(b)(5)(ii) is inapplicable, the RTC repudiated plaintiffs' contracts by placing plaintiffs on unpaid leaves of absence effective February 16, 1990.

### 1. *12 C.F.R. § 563.39*

Subchapter D, Chapter V, of Title 12 of the Code of Federal Regulations sets forth regulations applicable to all savings associations. Part 563 of Subchapter D sets forth regulations governing the "operations" of savings associations. Section 563.39 grants savings associations the authority to enter into em-

---

**4.** Section 1821(e) provides, in pertinent part, as follows:

**(1) Authority to repudiate contracts**
In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease—
**(A)** to which such institution is a party;

**(B)** the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and
**(C)** the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

ployment contracts with certain personnel; it also restricts that authority by requiring each contract to contain certain provisions. In pertinent part, § 563.39 provides as follows:

### § 563.39 Employment Contracts

(a) *General.* A savings association may enter into an employment contract with its officers and other employees only in accordance with the requirements of this section.

. . . . .

(b) *Required provisions.* Each employment contract shall provide that:

. . . . .

(5) All obligations under the contract shall be terminated, except to the extent determined that continuation of the contract is necessary of [sic] the continued operation of the association

. . . . .

(ii) By the Director [of the OTS] or his or her designee, ... when the association is determined by the Director to be in an unsafe or unsound condition.

Any rights of the parties that have already vested, however, shall not be affected by such action.

On February 15, 1990, the Director of the OTS determined FSA was in an unsafe and unsound condition. The RTC contends neither the Director nor the Managing Agent determined plaintiffs' continued employment was necessary for the continued operation of FSA. The RTC concludes, therefore, that plaintiffs have no claim for post-conservatorship compensation because their contracts terminated February 15, 1990, the date the Director determined FSA to be "unsafe and unsound." In response, plaintiffs provide almost no discussion of § 563.39. They argue, instead, that (1) certain actions by the RTC demonstrate their contracts were not terminated by operation of law and (2) their contracts survived because the Board of Directors instructed them to challenge in court the legality of the conservatorship. Although the RTC's argument has merit, the court concludes, for the purposes of this motion only, that § 563.39 does not defeat plaintiffs' post-conservatorship compensation claim.[5]

Section 563.39 authorizes a savings association to enter into employment contracts with its "*officers and other employees.*" (Emphasis added). Part 561 of Title 12 of the Code of Federal Regulations defines the terms "director" and "officer." Section 561.18(a) defines "director" generally as "any director ... or other person performing similar functions with respect to any organization whether incorporated or unincorporated." Section 561.35 defines "officer" specifically as follows:

the president, any vice-president (but not an assistant vice-president, second vice-

---

**5.** If § 563.39 applies to the instant case, all obligations under plaintiffs' contracts terminated February 15, 1990, the date the Director determined FSA to be "unsafe and unsound," except to the extent the Director or his designee determined continuation of plaintiffs' contracts was necessary for the continued operation of FSA. Thus, if § 563.39 applies, plaintiffs' post-conservatorship compensation claim turns on whether the Director or his designee determined plaintiffs' continued employment was necessary for the continued operation of FSA. In their memorandum in response, plaintiffs do not discuss whether the Director or his designee made this determination; instead, plaintiffs seem to argue the pre-conservatorship directive issued by FSA's Board of Directors somehow insulates their contracts from the operation of § 563.39. They provide no authority in support of this argument. Section 563.39(a) authorizes an association's board of directors to make employment contracts. Section 563.39(b) qualifies the authority extended by § 563.39(a) by requiring that each

contract contain certain restrictions; such as, the contract must provide that it terminates upon the Director's determination that the association is "unsafe and unsound." According to plaintiffs' argument, an association's board of directors can avoid § 563.39(b) merely by passing a directive that a certain officer or employee's contract shall survive a determination that the association is "unsafe and unsound." Plaintiffs' argument contradicts the plain language of § 563.39 and renders subsection (b) meaningless. Their argument is without merit.

Additionally, should § 563.39 apply, there appears to be some question whether plaintiffs' contracts even are enforceable under § 563.39(a). *See Aronson v. Resolution Trust Corp.*, 38 F.3d 1110, 1112–13 (9th Cir.1994) (holding senior vice president's oral employment agreement with a savings association unenforceable because § 563.39(a) requires employment contracts be written and approved by the association's board of director's; plaintiff's agreement was neither).

president, or other vice president having authority similar to an assistant or second vice-president), the secretary, the treasurer, the comptroller, and any other person performing similar functions with respect to any organization whether incorporated or unincorporated. The term *officer* also includes the chairman of the board of directors if the chairman is authorized by the charter or by-laws of the organization to participate in its operating management or if the chairman in fact participates in such management.

By defining each term individually, and differently, Part 561 distinguishes between "officers" and "directors"; additionally, Part 561 identifies specific situations in which a director also may be considered an officer for the purposes of the regulations. Thus, while the regulations clearly distinguish between the two terms, they also acknowledge there may be certain circumstances in which a director is the functional equivalent of an officer.

 The RTC assumes, without discussion, that plaintiffs are "officers" or "other employees."[6] The record before the court shows only that Fleischer was Chairman of the Board of Directors of FSA and Scowcroft was Vice Chairman. As such, they are directors as defined by § 561.18(a). The question presented is whether they also may be considered "officers" as defined by § 561.35. Section 561.35 includes as an "officer" the chairman of the board of directors if authorized to participate or actually participating in the "operating management" of the association. The key to inclusion is the individual's participation in the association's "operating management." The court is aware of no principled reason to distinguish a vice chairman from a chairman. In this respect, the court concludes that under § 561.35 a vice chairman of the board also may be considered an "officer" if authorized to participate or actually participating in the association's "operating management." Regardless, the RTC does not argue and the record currently before the court does not reflect that either Fleischer, as Chairman of the

Board, or Scowcroft, as Vice Chairman, was authorized to participate or actually participated in FSA's "operating management." Therefore, because the RTC fails to establish that plaintiffs were "officers" or "other employees" within the meaning of § 563.39, its argument based upon § 563.39(b)(5)(ii) must fail at this stage.

### 2. *Unpaid Leaves of Absence*

The RTC devotes much of its memoranda in support to its argument that plaintiffs were terminated as a matter of law pursuant to 12 C.F.R. § 563.39(b)(5)(ii). In the alternative, the RTC cursorily argues that even if § 563.39(b)(5)(ii) does not control, plaintiffs' claim still fails because they were employees-at-will whose right to compensation terminated when the RTC placed them on unpaid leaves of absence effective February 16, 1990. The RTC's argument is general, undeveloped, and unclear. The gist seems to be that since plaintiffs were employees-at-will, the RTC repudiated their contracts when it placed them on unpaid leaves of absence; however, the court confesses that after reading and re-reading the RTC's memoranda, the court remains uncertain as to the exact nature of this argument. Plaintiffs do not directly address the RTC's "unpaid leave of absence" argument. Instead, they argue generally that the RTC never repudiated their employment contracts with FSA; therefore, they are entitled to compensation because they performed pursuant to the Board's pre-conservatorship directive.

 Given the perfunctory treatment the RTC gives the "unpaid leave" argument in its memoranda, the court is unable to discern exactly what the RTC is arguing much less whether that argument merits summary judgment. The RTC never develops the argument beyond a general and ill-defined contention. When moving for summary judgment, a party must present at least some support for its view of the law. The court will not construct an entire argument from an unsupported contention. Due to the level

---

**6.** Chapter V of Title 12 does not define "employee"; however, because both "director" and "officer" are defined, the court understands the refer- ence to "other employees" to encompass all persons who are employed as neither directors or officers.

of generality at which it is presented, the court is unable to grant the RTC's motion on the basis of the "unpaid leave" argument.

**B. *Severance Pay***

Plaintiffs argue they are eligible for severance pay pursuant to the policy established by FSA post-conservatorship and made applicable to all employees. The RTC moves for summary judgment arguing plaintiffs' termination by operation of § 563.39(b)(5)(ii), also extinguished plaintiffs' right to severance pay.

▉▉▉▉▉ The severance pay policy submitted to the court states that for an employee to be eligible for severance pay his termination must have been based upon a reduction of the work force; that is, he must have been terminated due to a lay-off. Plaintiffs do not specifically contend they were laid-off as the result of a reduction in the work force; however, at this stage, reading the record before the court in the light most favorable to plaintiffs, it is unclear when or how plaintiffs were terminated. Because the RTC bases its argument solely on the assumption plaintiffs were terminated by operation of law, and because on the current record it is unclear whether § 563.39 applies to plaintiffs' contracts, the court must deny the RTC's motion with respect to plaintiffs' severance pay claim.

**C. *Relocation Expenses***

Scowcroft contends he is entitled to recover $69,291.71 in expenses incurred when he relocated from Connecticut to Kansas to accept employment with FSA. The RTC moves for partial summary judgment arguing $43,838.71 of the total was not properly approved under FSA's relocation policy and, alternatively, the *D'Oench, Duhme* doctrine bars its recovery. The court addresses first the RTC's objection under the *D'Oench, Duhme* doctrine.

**1. *D'Oench, Duhme***

The *D'Oench, Duhme* doctrine arises from *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). D'Oench, Duhme & Co.

was a brokerage firm which had sold bonds to a bank. The bank incurred a loss on the bonds and the brokerage firm executed a promissory note in favor of the bank to cover the loss. The parties agreed they did not intend that the note would be paid; however, their agreement was not recorded in the bank's files. The bank subsequently failed. The Federal Deposit Insurance Corporation assumed the note and sued to recover on it. The brokerage firm argued, in defense, that the parties never intended the note would be paid. The Supreme Court held that the brokerage firm was estopped from asserting a defense based upon a "secret agreement." *Id.* at 461, 62 S.Ct. at 681. In support, the Court explained that there is "a federal policy to protect [the FDIC], and the public funds which it administers, against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures or to which it makes loans." *Id.* at 457, 62 S.Ct. at 679.

Congress codified an expansive version of the *D'Oench, Duhme* doctrine in 1950 with the Federal Deposit Insurance Act. In 1989, the statutory version of the doctrine was incorporated by FIRREA. It now appears at 12 U.S.C. § 1823(e), which provides as follows:

> [n]o agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
>
> (1) is in writing;
>
> (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (4) has been, continuously, from the time of its execution, an official record of the depository institution.

Prior to the imposition of the conservatorship, FSA had a written policy, which it published in its personnel manual, setting forth the circumstances under which it would reimburse its employees for their relocation expenses. Scowcroft relocated from Connecticut to become the Vice Chairman of FSA's Board of Directors. He incurred various expenses as a result of the relocation. In December 1989, he submitted in writing, on a form apparently provided by FSA, an itemized list of the expenses for which he sought reimbursement. Shortly before the imposition of the conservatorship, Fleischer orally approved Scowcroft's expenses.

Scowcroft now seeks to recover these expenses. The RTC moves for partial summary judgment arguing § 1823(e) defeats Scowcroft's claim because Fleischer's approval does not meet each of § 1823(e)'s four numbered requirements.[7] In response, Scowcroft discusses generally the *D'Oench, Duhme* doctrine, but does not discuss § 1823(e).

In *D'Oench, Duhme*, the Supreme Court protected the FDIC's interest in an identifiable asset subject to a secret side agreement. Section 1823 also applies to an "agreement" made in connection with an "asset." In the instant case, no identifiable asset is in jeopardy; instead, the RTC's position appears to be that § 1823(e) extends the *D'Oench, Duhme* doctrine to preserve an association's assets, viewed in the aggregate, from all claims tending to diminish them, except those claims based upon agreements approved by the association's board or loan committee and clearly supported by the association's records. The RTC implicitly argues that since payment of Scowcroft's claim would cost money, and, therefore, reduce the aggregate value of the association's assets, the agreement giving rise to Scowcroft's claim must adhere to the strict requirements of § 1823(e).

The RTC reads § 1823(e) too broadly. The RTC points to and the court is aware of no case in which § 1823(e) has been used to defeat an employee's claim to recover pursuant to an association's written employment policy. The court's research has revealed only three cases discussing the effect of § 1823(e) on employment-related claims: none of which supports the RTC's position and one of which directly rejects it.[8] There appears to be no authority to support the RTC's implicit argument that § 1823(e) bars Scowcroft's claim because payment of that claim necessarily will reduce the general assets of the association. Although there is some general authority to the contrary,[9] the court finds the better reasoned view to be that a claim is not barred under § 1823(e) unless it is based upon an agreement that tends to diminish or defeat the conservator's interest in a particular asset. *See, e.g., Thigpen v. Sparks*, 983 F.2d 644, 646–49 (1993), *reh'g denied*, 990 F.2d 628 (5th Cir.1993); *Vernon v. Resolution Trust Corp.*, 907 F.2d 1101, 1107–08 (1990), *reh'g denied*, 990 F.2d 1270 (11th Cir.1993); *Cote d'Azur Homeowners Ass'n v. Venture Corp.*, 846 F.Supp.

---

7. Apparently, the RTC asserts this defense through § 1821(d)(9)(A), which provides in pertinent part as follows: "any agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the receiver or the Corporation." In *Thigpen v. Sparks*, 983 F.2d 644, 648–49 (5th Cir.1993), the Fifth Circuit explained that the modifiers used in § 1823(e), referencing an "agreement" in connection with an "asset" "acquired" by the association, are also expressed in § 1821(d)(9)(A). For the purposes of this motion, § 1821(d)(9)(A) does not alter the court's analysis of the RTC's argument. *See Thigpen*, 983 F.2d at 648–49; *In re NBW Commercial Paper Litigation*, 826 F.Supp. 1448, 1464–65 (D.D.C.1992).

8. *Bender v. CenTrust Mortg. Corp.*, 833 F.Supp. 1525, 1529–32 (S.D.Fla.1992) (refusing to grant the RTC's motion to dismiss plaintiff's employment-related claims, but leaving open the question regarding the applicability of § 1823(e)); *Belsky v. First Nat. Life Ins. Co.*, 653 F.Supp. 80, 84–85 (D.Neb.1986) (refusing to enforce side agreement which would have entitled former executive to the cash value of a specific life insurance policy—that is, a particular asset—owned by the failed bank), *aff'd*, 818 F.2d 661 (8th Cir.1987); *F.D.I.C. v. Brodie*, 602 So.2d 1358, 1360–61 (Fla.Dist.Ct.App.1992) (rejecting FDIC's argument that § 1823(e) barred failed bank's attorney's claim to recover on his contract for services rendered).

9. In *Cote d'Azur Homeowners Ass'n v. Venture Corp.*, 846 F.Supp. 827, 838–39 & n. 20–23 (N.D.Cal.1994), the district court provides a brief discussion of some of this general authority.

827, 831–32 & 836–38 (N.D.Cal.1994); *Beener v. LaSala*, 813 F.Supp. 303, 308–09 (D.N.J. 1993); *In re NBW Commercial Paper Litigation*, 826 F.Supp. 1448, 1463–64 (D.D.C. 1992); *First Financial Sav. Bank v. American Bankers Ins.*, 783 F.Supp. 963, 967 (E.D.N.C.1991); *Agri Export Cooperative v. Universal Sav. Ass'n*, 767 F.Supp. 824, 833 (S.D.Tex.1991); *F.D.I.C. v. Brodie*, 602 So.2d 1358, 1360–61 (Fla.Dist.Ct.App.1992). The court is persuaded this result gives effect to the plain language of § 1823(e) without offending the policy underlying the *D'Oench, Duhme* doctrine. Since Scowcroft's claim is based upon an agreement unrelated to a particular asset, the RTC's argument based upon § 1823(e) is rejected.

### 2. *The Relocation Policy*

 FSA's relocation policy authorized "assistance" to certain new hires who had to relocate to join the company. Under the policy, the employee's "hiring manager" and his or her division head were charged with negotiating relocation expenses at the time of the job offer. In short, the policy required that all expenses be pre-approved by the "hiring manager" and the Director of Human Resources.

Scowcroft submitted an expense request in early December 1989. Human Resources reviewed the request at least by February 13, 1990. Following review by Human Resources, the request was sent to Fleischer for approval. With his Memorandum in Support, Scowcroft has submitted a relocation expense form, which both Fleischer and Scowcroft apparently initialled, at the bottom of which is the following notation, "[t]his form to be used only to report those relocation expenses approved at the time of the job offer." Plaintiffs' Memorandum in Opposition, Exhibit P. There is no dispute Fleischer approved Scowcroft's expenses in toto February 14, 1990.

The RTC moves for partial summary judgment arguing $43,838.71 of Scowcroft's claim must fail because his request was never approved by both his "hiring manager" and the Director of Human Resources. It is undisputed Fleischer, who apparently was Scowcroft's hiring manager, approved his request.

What is unclear, however, is whether, and to what extent, the Director of Human Resources approved his request. In February 1990, Beverly Johnston was FSA's Director of Human Resources. *See* RTC's Memorandum in Support, Ex. 6. She did not initial the form submitted by Scowcroft in Exhibit P of Plaintiffs' Memorandum in Opposition; however, she did prepare a memorandum dated February 13, 1990, which arguably represents her approval of at least some portion of Scowcroft's request. *See* Plaintiffs' Memorandum in Opposition, Exhibit P. Reading the evidence submitted in the light most favorable to Scowcroft, the court concludes there is a genuine issue of fact whether Scowcroft's expenses were approved in accordance with FSA's policy. The RTC's motion is denied as to Scowcroft's claim for relocation expenses.

## IV. *CONCLUSION*

**IT IS BY THE COURT THEREFORE ORDERED** that the RTC's motion for partial summary judgment (Doc. 145) is denied.